# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **R.A.F., a minor, by and through her mother as natural guardian and next friend, Debra S. Woodall, f/k/a Debra S. Fondren**, | ) ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ACTION NO: 2:07 CV-00192-WKW** |
| | ) | |
| **THE SOUTHERN COMPANY PENSION PLAN AND THE SOUTHERN COMPANY PENSION PLAN RETIREMENT BOARD,** | ) ) ) ) ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants The Southern Company Pension Plan ("the Plan") and Southern Company Pension Plan Retirement Board (the "Retirement Board"), as fiduciary and administrator for the Plan, (hereinafter collectively referred to as "Defendants"), request that this Court enter an Order under Rule 56 of the Federal Rules of Civil Procedure granting summary judgment in their favor on all claims asserted by Ms. Woodall. There are no genuine issues of material fact with respect to Ms. Woodall's claims and, therefore, Defendants are entitled to judgment as a matter of law. This Motion is supported by the pleadings, the declaration of Nancy

Jones, with exhibits, and the administrative record, which have been filed of record

with the Clerk of Court.  This motion also is based upon the following:

## TABLE OF CONTENTS

TABLE OF CITATIONS ......................................................... iii

I.      INTRODUCTION ......................................................1

II.     NARRATIVE STATEMENT OF MATERIAL, UNDISPUTED FACTS.....3

        Background Facts ....................................................3

        The Applicable Plan Provisions ......................................5

        The Board's Development of QDRO Policies ..............................7

        Ms. Woodall's Claim for Benefits and the Board's Subsequent Denial........9

        Plaintiff's Appeal of the Board's Denial of Benefits ....................11

III.    STANDARD OF REVIEW ............................................14

        A.      The Summary Judgment Standard in the ERISA Context.................14

        B.      The Arbitrary and Capricious Standard of Review Applies to the
                Retirement Board's Decision Denying Ms. Woodall's Claim for
                Survivorship Benefits. ........................................15

                1.      The Plan delegates discretionary authority to the Retirement
                        Board. ..............................................17

                2.      The Eleventh Circuit's framework for application of the
                        arbitrary and capricious standard of review.............................19

        C.      The Scope of Judicial Review is Limited to the Facts that Were
                Known to the Claims Administrator. ..................................20

IV.     OVERVIEW OF THE LAW RELATING TO QUALIFIED
        DOMESTIC RELATIONS ORDERS..........................................21

V.      ARGUMENT.............................................................23

        A.      The Retirement Board's Determination that Ms. Woodall is not
                Entitled to Benefits is Correct Because the Plan Provisions and the
                QDRO Procedures Relating to Entitlement to Benefits are Clear

and Unambiguous, and the Board's Decision is Supported by the
Administrative Record. .......................................................................24

    1.    Ms. Woodall is not Entitled to Benefits under General Plan
Rules Relating to Survivor Benefits. .........................................24

    2.    Ms. Woodall likewise is not entitled to survivor benefits
under the terms of the Plan where she failed to present a
valid QDRO to the Retirement Board before Mr. Fondren's
death and failed to explain why She could not have
presented a valid QDRO between the entry of the Divorce
Decree on February 14, 2001 and when Mr. Fondren
disappeared in March 2003. ........................................................26

B.    The Divorce Decree Does Not Meet the Legal Standard Under
ERISA for a QDRO As a Matter of Law Where the Divorce
Decree Fails to Meet ERISA's Specificity Requirements. .................34

    1.    Whether domestic relations order meets the statutory
requirements for a QDRO is a question of law for the court....34

    2.    The Divorce Decree Does not contain the requisite
specifications to be considered a QDRO. ..................................34

    3.    Payment of the survivor benefits sought by Ms. Woodall in
this case would require the Plan to provide a type or form of
benefit not otherwise provided under the Plan. ........................39

CONCLUSION ....................................................................................................41

# <u>TABLE OF CITATIONS</u>

## <u>Cases</u>

*Anderson v. Blue Cross/Blue Shield of Alabama*, 907 F.2d 1072
(11th Cir. 1990)..................................................................................16

*Bendixen v. Standard Ins. Co.*, 185 F.3d 939 (9th Cir. 1999) ..................................14

*Boggs v. Boggs*, 520 U.S. 833 (1997) .....................................................................22

*Branco v. UFCW-Northern California*, 279 F.3d 1154 (9th Cir. 2002)..................34

*Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556
(11th Cir. 1990), *cert. denied*, 498 U.S. 1040 (1991)........................ 16, 19, 21

*Buckley v. Metropolitan Life*, 115 F.3d 936 (11th Cir. 1997)...................................16

*Central States, Southeast & Southwest Areas Pension Fund v. Howell*,
227 F.3d 672 (6th Cir. 2000) ............................................................38

*Clark v. Hartford Life and Accident Ins. Co.*, No. 8:05-cv-67-T-23MAP,
2006 WL 890660 (M.D. Fla. April 6, 2006) .................................................14

*Crume v. Met. Life Ins. Co.*, 417 F. Supp. 2d 1258 (M.D. Fla. 2006)............. 14, 15

*Curran v. Kemper Nat. Servs., Inc.*, No. 04-14097, 2005 WL 894840
(11th Cir. March 16, 2005) ....................................................... 14, 15

*Denton v. First Nat'l Bank of Waco*, 765 F.2d 1295 (5th Cir. 1985) ............... 19, 20

*Dial v. NFL Player Supplemental Disability Plan*, 174 F.3d 606
(5th Cir. 1999) ...............................................................................34

*Epolito v. Prudential Ins. Co.*, No. 3:06-cv-628-J-16MCR,
2007 WL 2964175 (M.D. Fla. 2007).............................................................14

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989) ........... 15, 16, 17, 19

*Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755
(11th Cir. 1996)...............................................................................19

*Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37
(11th Cir. 1989) ............................................................................16

*Guzman v. Commonwealth Edison Co., et al.*, No. 99c582,
2000 WL 1898846 (Dec. 28, 2000 N.D. Ill.) ...................................... passim

*HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*,
240 F.3d 982 (11th Cir. 2001) ............................................... 16, 19

*Hogan v. Raytheon Co.*, 2001 WL 34148157 (N.D. Iowa 2001) ...........................41

*Jett v. Blue Cross/Blue Shield of Alabama, Inc.*, 890 F.2d 1137
(11th Cir. 1989) ........................................................ 16, 21

*Johnson v. Johnson, et al.*, 541 So. 2d 554 (Ala. Civ. App. 1989) .................. 23, 40

*Julia v. Bridgestone/Firestone, Inc.*, 101 Fed. Appx. 27 (6th Cir. 2004)................34

*Kimble v. Metropolitan Life Ins. Co., et al.*, 969 F. Supp. 599
(E.D. Cal. 1997)...........................................................................28

*Leahy v. Raytheon Co.*, 315 F.3d 11 (1st Cir. 2002) .................................14

*Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547 (11th Cir. 1994)...... 16, 20

*Pittman v. Pittman*, 419 So. 2d 1376 (Ala. 1982)....................................37

*Samaroo v. Samaroo*, 193 F.3d 185 (3d. Cir. 1999)............................ 25, 30, 31, 40

*Torres v. Pittston Co.*, 346 F.3d 1324 (11th Cir. 2003)...........................16

*Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132
(11th Cir. 2004)..............................................................................16

## Statutes

26 U.S.C. § 414 ................................................................. passim

29 U.S.C. § 1056 ................................................................. passim

29 U.S.C. § 1104 .......................................................................28

iv

29 U.S.C. §§ 1001, *et. seq.* ............................................................................ 1

ERISA § 206(d)(3)(G)(ii) ........................................................................ 26, 40

## I.    INTRODUCTION

*Statement of the Case*

This is an ERISA[1] benefits case.  Plaintiff Debra Woodall seeks survivor

benefits in her ex-husband's, David R. Fondren's, pension benefits.   The Plan

provides for a survivor benefit only to the spouse to whom the participant was

married at the time of his death or to an alternate payee pursuant to a valid

Qualified Domestic Relations Order ("QDRO").   Ms. Woodall and Mr. Fondren

had been divorced for two years and nine months when his body was discovered.

Since she was not married to Mr. Fondren at the time of his death, the only way

she is eligible to receive the survivor benefits she seeks in this case is pursuant to a

valid QDRO.  Ms. Woodall waited nearly two more years following the discovery

of her ex-husband's body before she submitted a domestic relations order to the

Retirement Board for approval as a QDRO, via letter of her attorney dated

September 15, 2005, for the purpose of seeking survivorship rights in Mr.

Fondren's pension benefits.

The Retirement Board denied Ms. Woodall's request on the grounds that an

award of survivor benefits where over two years had elapsed between the entry of

the Final Judgment of Divorce and Mr. Fondren's death and where Ms. Woodall

had not offered any explanation for the delay, would have violated Plan terms and

---

[1] The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§
1001 , *et. seq.*

1

the Retirement Board's QDRO Procedures.  The Retirement Board's decision was based upon the Plan documents and was consistent with the Retirement Board's QDRO Procedures, which state that as a general rule, a domestic relations order will not be approved if submitted after the death of a former plan participant.  The policy behind the QDRO Procedures and the Retirement Board's position is that in a case like the present one, it is critical to have consistent requirements and it is impossible for the Retirement Board to ascertain the decedent's intent.

*Procedural Posture*

Ms. Woodall filed the complaint in the Circuit Court for Lowndes County, Alabama, as natural guardian and next friend of her minor daughter, R.A.F. Defendants timely removed this case to this Court.  The complaint seeks a declaration and seeks survivorship benefits under an employee pension benefit plan governed by ERISA.

Ms. Woodall alleges in the complaint that the Final Judgment of Divorce entered February 14, 2001, in the Circuit Court of Lowndes County, Alabama, is a Qualified Domestic Relations Order ("QDRO") entitling her to receive the Participant's benefits.  Throughout her complaint, Ms. Woodall requests that this Court:  (1) construe the Divorce Decree as a Domestic Relations Order; (2) construe the provisions of the Plan and declare that the she is entitled to survivor benefits under the terms of the Plan; (3) declare the Divorce Decree a valid QDRO

and order Defendants to pay benefits; and (4) grant plaintiff additional, different, and further relief as to which she may be entitled.

Defendants are entitled to judgment as a matter of law because the Retirement Board's interpretation of the Plan provisions at issue was correct, and its application of the facts to the Plan provisions was reasonable and supported by substantial evidence and, therefore, is neither arbitrary nor capricious. Defendants also are entitled to summary judgment as a matter of law because the Divorce Decree does not meet ERISA's specificity requirements for a QDRO.

## II.    NARRATIVE STATEMENT OF MATERIAL, UNDISPUTED FACTS
### Background Facts

1.    David R. Fondren, deceased, formerly was a participant in the Southern Company Pension Plan through his employment with Alabama Power Company, a wholly owned subsidiary of The Southern Company. (Jones Decl. at ¶ 2).

2.    A true and correct copy of The Southern Company Pension Plan effective as of January 1, 1997, including the First Amendment thereto, is included within the Administrative Record[2]. (AR-001 through AR-297). A true and correct copy of The Southern Company Pension Plan effective as of January 1, 2002, with

---

[2] The Administrative Record is attached as an Exhibit to the Declaration of Nancy Jones and will be referred to throughout as "AR."

amendments, is included within the Administrative Record. (AR-298 through AR-388).

3.      True and correct copies of the relevant sections of the 1997 summary plan description ("SPD"), entitled "Your Guide to Benefits" (the "Guide") are included in the Administrative Record. (AR-297A through AR-297OO). True and correct copies of the relevant sections of the 2002 Guide are included in the Administrative Record. (AR-389 through AR-429). True and correct copies of the relevant sections of the 2003 Guide are included in the Administrative Record. (AR-430 through AR-482).

4.      Ms. Woodall is the former wife of Mr. Fondren. (Amended Complaint, Docket No. 13, at ¶6) (hereinafter referred to as "Compl.").

5.      Ms. Woodall was divorced from Mr. Fondren on February 14, 2001, pursuant to a Final Judgment of Divorce entered by the Circuit Court for Lowndes County (the "Divorce Decree"). (Compl. ¶ 7).

6.      Mr. Fondren was determined to be missing in March of 2003. (Compl. ¶ 8).

7.      Mr. Fondren's body was discovered on November 20, 2003. (Compl. ¶ 9, AR 551).

4

8.    At the time of Mr. Fondren's death, the Plan identified him as "Single."  He had not remarried, and the Plan had not received a valid QDRO naming Ms. Woodall as an alternate payee.  (Jones Decl. at ¶ 4).

## The Applicable Plan Provisions

9.    The Plan designates the Retirement Board as the Administrator of the Plan and delegates to the Retirement Board the discretionary authority to interpret the Plan, decide all questions of eligibility for benefits, and determine the amount of benefits.  The Plan also provides that the Administrator's decisions are final. (*See* 1997 Plan at AR-64 through AR-65; 1997 SPD at AR-297NN; 2002 Plan at AR 361-62; 2002 SPD at AR-427; 2003 SPD at AR-480).

10.    Under the terms of the Plan, in the event a participant dies before distribution of his pension benefits commences (like Mr. Fondren), a survivor benefit shall be paid only to the spouse to whom the participant was married at the time of his death, except that the participant, with the spouse's consent, may elect to have the pension benefits paid only to the participant.  (*See* 1997 Plan at AR-44 through AR-55, AR-218; 1997 SPD at AR-297-K; 2002 Plan at AR-327, AR-341 through AR-354; 2003 SPD at AR-438 through AR-439).

11.    The Plan and SPD further provide that "[i]f you are single when you die, all Plan benefits end."  (*See* 1997 Plan at AR-44 through AR-55; 1997 SPD at

AR-297-J; 2002 Plan at AR-341 through AR-354; 2002 SPD at AR-399; 2003 SPD at AR-446).

12.    The Plan provides for survivor benefits to an ex-spouse or other alternate payee in the case of a valid QDRO.  (See 1997 Plan, Section 14.2 at AR-68; 2002 Plan, Section 14.2 at AR-370).

13.    Consistent with the Plan, the SPD provided to participants provides:

If your spouse dies or you divorce before your payments begin, you should notify the Employee Service Center at 1-888-435-7563.  Then your election of a joint and survivor annuity or survivor annuity with restoration will end, and no benefits will be payable after your death.  Your benefit will be paid as if you had always been single.  If your ex-spouse has a Qualified Domestic Relations Order, he or she may be entitled to all or a portion of your pension benefit.  See the section titled Other Information for more details on Qualified Domestic Relations Orders.

(1997 SPD at AR-297I; 2002 SPD at AR-397; 2003 SPD at AR-441).

14.    With regard to QDROs, the SPD further provides in pertinent part:

QUALIFIED DOMESTIC RELATIONS ORDER

A state court may order that your spouse, former spouse, or other alternate payee is entitled to receive a portion or all of your benefits under the Plan.  For example, a court may issue this type of order in the event you and your spouse divorce.  Under federal law, however, your alternate payee may receive some of your Plan benefits only if the Retirement Board receives what is known as a "Qualified Domestic Relations Order" (QDRO) signed by the court.  The Retirement Board has established procedures for notifying your or anyone entitled to benefits that are the subject of a court order and for establishing whether a court order is a QDRO. …

PAYMENTS UNDER A QDRO

6

> A court order cannot require that any of your benefits be paid to your alternate payee at any time or in any form that is not otherwise authorized under the Plan.

(1997 SPD at AR-297L; 2002 SPD at AR- 400; 2003 SPD at AR-449).

15.    Thus, only the surviving spouse of a participant, or an alternate payee pursuant to a valid QDRO, is entitled to survivor benefits under the terms of the Plan.

### The Board's Development of QDRO Policies

16.    Pursuant to ERISA, 29 U.S.C. § 1056(d)(3)(G)(ii)[3], and the terms of the Plan, the Retirement Board is to establish written procedures governing its handling and processing of QDROs.  Specifically, the Plan provides:

> The Retirement Board and Trustee shall establish procedures for (a) notifying Employees and alternative payees who have or may have an interest in benefits which are the subject of domestic relations orders, (b) determining whether such domestic relations orders are qualified domestic relations orders under Section 414(p) of the Code, and (c) distributing benefits which are subject to qualified domestic relations orders.  In addition, the Retirement Board and Trustee shall permit alienation, assignment or other attachment where otherwise permitted under Code Section 401(a)(13).

(1997 Plan, Section 14.2 at AR-74; 2002 Plan, Section 14.2 at AR-370); *See also* Code § 414(p)(6)(B)[26 U.S.C. § 414(p)(6)(B)].

---

[3] 29 U.S.C. § 1056(d)(3)(G)(ii) provides as follows:  "Each plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distribution under such qualified orders. …"

17.    The Retirement Board in fact established such procedures (the "QDRO Procedures").  (AR-502 through AR-511 [dated May 16, 2005]; AR-566 through AR-570 [dated January 7, 2003]).   In accordance with these QDRO Procedures, the Retirement Board must address whether a submitted order or other document qualifies as a QDRO.  In making its determination, the Board considers whether the order complies with its own procedures as well as the ERISA provisions contained in 29 U.S.C. § 1056(d)(1) (2000), *et seq*. and Internal Revenue Code provisions contained in 26 U.S.C. § 414(p), *et seq*.

18. Paragraph III.C. of the QDRO Procedures addresses the treatment of a domestic relations order that is received after the death of a plan participant and provides as follows:

> If the QDRO Coordinator determines that the participant died prior to the time the Order is received, the QDRO Coordinator shall notify all surviving parties named in the Order and each named representative that an Order generally cannot qualify as a QDRO unless it is received before the death of the participant.  In such event, the party seeking the QDRO may file a claim with the Board, in accordance with the terms and procedures under the Pension Plan, requesting that the Board consider whether an Order entered with respect to the deceased participant could constitute a QDRO.  The Board shall then determine whether the Order could constitute a QDRO even though it was received after the death of the participant.  The Board shall take into account the facts and circumstances it deems significant in making such determination including, but not limited to, whether there was sufficient time to obtain an Order prior to the death of the participant.

(AR-504; AR-568).

19.    Section 206(d)(3)(G)(ii) of ERISA, 29 U.S.C. § 1056(d)(3)(G)(ii), requires in relevant part that each plan governed by ERISA, such as the Plan, "establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders." *See also* 26 U.S.C. § 414(p)(6)(B).    The Retirement Board established the general rule that an order cannot qualify as a QDRO unless it is received before the death of the participant to establish an unequivocal plan requirement and thereby promote consistency, accuracy and uniformity throughout its process of determining entitlement to benefits.    Written procedures, as mandated by ERISA, are established to govern this specific situation to ensure that the Retirement Board is not left attempting to guess the intent of the participant in his or her decision to name or not to name an alternate payee.  (Jones Decl. at ¶10).

### Ms. Woodall's Claim for Benefits and the Board's Subsequent Denial

20.    In a letter dated May 25, 2004, Ms. Nancy Jones, as Principal, Pension Plan Administration, responded to an initial, informal inquiry by counsel for Ms. Woodall regarding survivor benefits under the Plan.  (AR-559 through AR-570).  The letter provided basic information about QDROs and explained that, as a general rule the Plan does not provide survivor benefits in the event a QDRO is submitted after the death of the participant.  (*Id.*)  Ms. Jones enclosed a copy of the QDRO Procedures and a copy of a form QDRO.  (*Id.*)

21.    In a letter dated September 15, 2005, more than four years after the divorce and nearly two years after Mr. Fondren's body was discovered, counsel for Ms. Woodall submitted to the Plan a proposed, unexecuted domestic relations order, seeking survivor benefits  Counsel also submitted an affidavit of Ms. Woodall and the death certificate for Mr. Fondren.  (AR-545 through AR-551). The domestic relations order cited the following provisions from the Final Judgment of Divorce entered by the Circuit Court for Lowndes County on February 14, 2001, as support that Mr. Fondren intended for survivorship benefits to be paid to Ms. Woodall in the event of his death:

> 9.    For and during the time that the Defendant is obligated To pay child support herein, Defendant shall maintain And name the Plaintiff the beneficiary, as Trustee for The minor child of the Parties, for all of his employment Benefits such as retirement, pension, savings plans and Stock ownership plans.
>
> 10.    As property settlement herein, Defendant is awarded Ownership of all employment benefits, as stated above, Subject to the beneficiary designation required herein."

(AR-546).  The letter did not enclose a copy of the Divorce Decree.

22.    At no time following the Divorce Decree of February 14, 2001, or the discovery of Mr. Fondren's body in November 2003, was Ms. Woodall, as Trustee for the minor child, named as beneficiary of the Plan benefits.  As of the time of his death, Mr. Fondren was single.  He had not remarried, and the Plan had not

10

received a valid QDRO naming Ms. Woodall as an alternate payee.  (Jones Decl. at ¶ 10).

23.    By letter dated November 29, 2005, Mr. Gregory F. Marshall, Secretary, Southern Company Retirement Board, responded to counsel's letter of September 15, 2005.  (AR-533 through AR-544).  Mr. Marshall's letter explained that the domestic relations order submitted by counsel would not constitute a QDRO because the QDRO Procedures of the Retirement Board generally do not allow a domestic relations order entered after the death of a plan participant to be treated as a QDRO.  (AR-533).  The letter again enclosed copies of the QDRO Procedures (AR-535 through AR-539) and a sample QDRO form (AR-540 through AR-544).  The letter also explained Ms. Woodall's appeal rights under ERISA and the Plan.  (*Id.*).

### Plaintiff's Appeal of the Board's Denial of Benefits

24.    By letter dated January 26, 2006, counsel for Ms. Woodall requested an appeal of the Retirement Board's decision of November 29, 2005.  (AR-525 through AR-532).  Counsel also enclosed with the letter an affidavit of Ms. Woodall (AR-527 through AR-528) and a proposed, unexecuted order (AR-529 through AR-532)[4].  Counsel noted that Ms. Woodall was asserting a claim as an

---

[4] While counsel's letter references an enclosed copy of the Divorce Decree, the letter failed to include the copy.  Therefore, the Administrative Record does not contain a copy of the Divorce Decree.

alternate payee in two capacities: (1) "as Trustee for [R.A.F.], minor child"; and (2) "[a]s the individual owner/alternate payee of the employment benefits of the deceased subject to the child support obligations specified in paragraph 9 of the Decree."

25.    The Retirement Board reviewed Plaintiff's appeal on May 12, 2000. (*See* Minutes of Retirement Board Meeting, AR-487 through AR-490 and exhibits A-G thereto, AR-491 through AR-523).

26.    In reviewing the appeal, the Retirement Board considered the facts and circumstances associated with the appeal, the original claim and the claim denial letter. (AR-487 through AR-499). The Retirement Board also reviewed and considered its QDRO Procedures and previous cases involving submission of domestic relations orders following the death of the plan participant. (AR-502 through AR-506; AR-520 through AR-23).

27.    Because of the Retirement Board's general rule that post-mortem orders will not be accepted, the fact that Ms. Woodall had ample time to obtain a QDRO from the court and submit it to the Retirement Board during the two year time period between the Divorce Decree and Mr. Fondren's disappearance, and because Ms. Woodall provided no extenuating circumstances preventing a timely submission of a domestic relations order, the Board denied the appeal. (AR 487-89). The Retirement Board noted that exceptions to the general rule "would be

limited to situations where the parties acted in an expeditious manner following the date of property settlement or divorce, but the death of the Plan participant occurred before the proposed alternate payee could have reasonably submitted a qualified domestic relations order." (Board Minutes, AR-488 and Exhibit F [AR-520 through AR-521] and Exhibit G [AR-522 through AR-523] thereto).

28.    By letter dated May 26, 2006, Ms. Nancy Jones, Secretary, Southern Company Retirement Board, informed counsel for Ms. Woodall that the Retirement Board had denied Ms. Woodall's appeal. (AR-484 through AR-486). The Retirement Board determined that there would have been ample time between the date of the Divorce Decree (February 14, 2001) and the time Mr. Fondren was determined to be missing (March 2003) for Ms. Woodall to have obtained a sufficient domestic relations order and to have submitted it to the Retirement Board. In addition, Ms. Woodall failed to submit any evidence to the Retirement Board that she had made any attempts to obtain a QDRO following the divorce and before Mr. Fondren's disappearance and the subsequent discovery of his body. (*Id.*).

29.    On January 30, 2007, Ms. Woodall commenced this civil action requesting that this Court construe the Divorce Decree as a QDRO and declare plaintiff as the beneficiary of the Participant's pension benefits. (Compl. ¶ 13).

## III.    STANDARD OF REVIEW

### A.    The Summary Judgment Standard in the ERISA Context.

"[I]n an ERISA benefit denial case … in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Curran v. Kemper Nat. Servs., Inc.*, No. 04-14097, 2005 WL 894840, *7 (11th Cir. March 16, 2005) (brackets in original) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)); *accord Clark v. Hartford Life and Accident Ins. Co.*, No. 8:05-cv-67-T-23MAP, 2006 WL 890660, *2 (M.D. Fla. April 6, 2006)."  '[W]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'"  *Crume v. Met. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)); *See also Epolito v. Prudential Ins. Co.*, No. 3:06-cv-628-J-16MCR, 2007 WL 2964175 at *3 (M.D. Fla. 2007) ("In an ERISA case, the Court does not take evidence.  Instead its role is to evaluate the reasonableness of the administrative determination in light of the record complied before the plan fiduciary.") (citing *Curran*, 2005 WL 894840).

14

Therefore, the standard in ERISA benefits denial cases is an altered version of the traditional summary judgment rules.  In essence, in an ERISA benefit denial case, "the district court sits more as an appellate tribunal than as a trial court." *Curran*, 2005 WL 894840.  The *Crume* court explained the ERISA standard as follows within the context of a claim for disability benefits:

> [W]here the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the "normal" summary judgment rules can sensibly apply.  After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point.  In other words, conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.

(*Id.*) at 1273.

Accordingly, the proper standard of review is set forth in *Curran* and *Crume*.  This standard essentially modifies the traditional Rule 56 standard for ERISA benefits cases.

> **B.**    **The Arbitrary and Capricious Standard of Review Applies to the Retirement Board's Decision Denying Ms. Woodall's Claim for Survivorship Benefits.**

While the ERISA statute does not set forth a standard of review for an administrator's denial of benefits, the United States Supreme Court, in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), established three distinct standards for reviewing administrators' plan decisions: "'(1) de novo where the

15

plan does not grant the administrator discretion [i.e., does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] . . . [he has] . . . a conflict of interest.'" *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1134 (11th Cir. 2004) (quoting *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co*., 240 F.3d 982, 993 (11th Cir. 2001)). *See also Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1549-50 (11th Cir. 1994); *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1559 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040 (1991); *Anderson v. Blue Cross/Blue Shield of Alabama*, 907 F.2d 1072, 1075 (11th Cir. 1990); *Jett v. Blue Cross/Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1138-39 (11th Cir. 1989)). Under the arbitrary and capricious standard of review, the Retirement Board's interpretation of the relevant plan provisions must not be disturbed if reasonable. *Firestone*, 489 U.S. at 111; *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38-39 (11th Cir. 1989). Review of the Retirement Board's factual determinations is also governed by the arbitrary and capricious standard. *Williams*, 373 F.3d at 1134, n.3; *Torres v. Pittston Co*., 346 F.3d 1324 (11th Cir. 2003); *Buckley v. Metropolitan Life*, 115 F.3d 936 (11th Cir. 1997).

16

1.    **The Plan delegates discretionary authority to the Retirement Board.**

In order to invoke the arbitrary and capricious standard of review, the plan document must "give[] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 498 U.S. at 115.  The relevant Summary Plan Description ("SPD") contains language that unequivocally gives the administrator discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. Specifically, the SPD provides as follows:

## PLAN ADMINISTRATOR DISCRETION

The Plan Administrator (or, for insured plans, the insurer) of each Plan (or its delegate) has the exclusive discretionary authority to:

- interpret the Plan
- decide all questions of eligibility for benefits
- determine the amount of these benefits

The Plan Administrator's decisions are final.

(1997 SPD at AR-297NN; 2002 SPD at AR-427; 2003 SPD at AR-480).

Furthermore, Section 10.3 of the Plan provides as follows:

The Retirement Board, in addition to the functions and duties provided for elsewhere in the Plan, shall have excusive discretionary authority for the following:

(a)    construing and interpreting the Plan;

17

(b) determining all questions affecting the eligibility of any Employee, retired Employee, former Employee, Provisional Payee, or alternate payee;

(c) determining all questions affecting the amount of the benefit payable hereunder;

(d) ascertaining the person to whom benefits shall be payable under the provisions hereof;

(e) to the extent provided in the Plan, authorizing and directing disbursements of benefits from the Plan;

(f) making final and binding determinations in connection with any questions of fact which may arise regarding the operation of the Plan;

(g) Making such rules and regulations with reference to the operation of the Plan as it may deem necessary or advisable, provided that such rules and regulations shall not be inconsistent with the express terms of the Plan or ERISA;

(h) prescribing such procedures and adopting such forms as it determines necessary under the terms of the Plan; and

(i) reviewing such denials of claims for benefits as may arise.

Any action by the Retirement Board under this Section 10.3 shall be binding and conclusive.  To the extent that the Retirement Board delegates any of the foregoing duties or functions to another party, the Retirement Board retains the ultimate authority to act in accordance with this Section 10.3.

(1997 Plan at AR-065; 2002 Plan at AR-361 through AR-362) (emphasis supplied).

Because the Plan clearly grants the Retirement Board the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan,"

18

*Firestone*, 498 U.S. at 115, the arbitrary and capricious standard of review applies in this case.

> ### 2.    The Eleventh Circuit's framework for application of the arbitrary and capricious standard of review.

The Eleventh Circuit Court of Appeals has further explained the framework for application of the arbitrary and capricious standard of review as follows: "[T]he court evaluates the claims administrator's interpretation of the plan to determine whether it was 'wrong.'" *HCA*, 240 F.3d at 993 (quoting *Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755, 759 (11th Cir. 1996)). In determining whether the claims administrator's interpretation was "wrong," the court should first review the plan documents and disputed terms from a *de novo* perspective. *Brown*, 898 F.2d at 1566, n.12 (citing *Denton v. First Nat'l Bank of Waco*, 765 F.2d 1295, 1304 (5th Cir. 1985) (first step in application of arbitrary and capricious standard is determining legally correct interpretation of disputed plan provision)). If the court concludes that the claims administrator's determination was correct from a *de novo* perspective, its analysis should stop there. The court need not consider the effect of a potential conflict of interest, and the claims administrator is entitled to judgment as a matter of law. *HCA*, 240 F.3d at 993.

In the event the court determines that the claims administrator's decision was "wrong" from a *de novo* perspective, it must "then proceed[] to decide whether 'the claimant has proposed a 'reasonable' interpretation of the plan.'" *Id.*

19

(quoting *Lee*, 10 F.3d at 1550). However, even if the court determines the claimant's proposed interpretation is reasonable, she does not necessarily prevail. This Court would then have to determine whether the claims administrator's "wrong determination is nonetheless reasonable." *Id.* at 994. Under the arbitrary and capricious standard of review, a claims administrator's wrong but nonetheless reasonable decision "is entitled to deference even though the claimant's interpretation also is reasonable." *Id.*

In this case, as discussed below, the Retirement Board's determination that Ms. Woodall is not entitled to the survivor benefits under the Plan is correct from a *de novo* perspective under the first prong of the Eleventh Circuit's framework. Therefore, Defendants are entitled to judgment as a matter of law on all of Ms. Woodall's claims.

### C.    The Scope of Judicial Review is Limited to the Facts that Were Known to the Claims Administrator.

On deferential review of the Retirement Board's administrative decision, this Court is required to confine its analysis to the facts that were known to the Retirement Board during the administrative appeal. "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with the abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."

*Jett*, 890 F.2d at 1139 (emphasis added) (citing *Brown v. Retirement Committee of*

*Briggs & Stratton Retirement Plan*, 797 F.2d 521, 531 (7th Cir. 1986)) (noting that

a federal court is to focus on the evidence before the trustee at the time of the final

decision and is not to hold a *de novo* factual hearing), *cert. denied*, 479 U.S. 1094

(1987)).  "As long as a reasonable basis appears for [the claims administrator's]

decision, it must be upheld as not being arbitrary and capricious, even if there is

evidence that would support a contrary decision."  *Jett*, 890 F.2d at 1140.

## IV.  OVERVIEW OF THE LAW RELATING TO QUALIFIED DOMESTIC RELATIONS ORDERS.

As a general rule, assignment or alienation of pension benefits is prohibited

under ERISA.  29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that

benefits provided under the plan may not be assigned or alienated").[5]

A limited exception to ERISA's anti-alienation provision is a pension

benefit conferred through a Qualified Domestic Relations Order ("QDRO").  29

U.S.C. § 1056(d)(3)(A).  ERISA defines a QDRO as an order entered in a state

domestic relations action that "assigns to an alternate payee the right to [] receive

all or a portion of benefits payable with respect to a participant under a plan."  29

U.S.C. § 1056(d)(3)(B)(i)(I).  QDROs include orders "relat[ing] to child support,

alimony payments, or marital property rights to a spouse, former spouse, child, or

---

[5] Equivalent provisions are set forth in the Internal Revenue Code.  26 U.S.C. §414(p), *et seq.*

other dependent of a participant" or "made pursuant to a state domestic relations law." 29 U.S.C. § 1056(d)(3)(B). Congress enacted the QDRO provision to "give enhanced protection to the spouse and dependent children in the event of divorce or separation . . . ." *Boggs v. Boggs*, 520 U.S. 833, 847 (1997).

In providing for an exception to the anti-alienation provision, Congress was also very specific that certain conditions first must be met. In order for a domestic relations order ("DRO") to be considered a QDRO for purposes of the exception, a DRO must clearly specify the following things:

(i)    the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii)   the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii)  the number of payments or period to which such order applies, and

(iv)   each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C) (2000).

Finally, Congress was also very clear that a DRO cannot be qualified as a QDRO if the result would be to require a plan to pay a benefit that otherwise is not available under the terms of the plan. The statute provides in pertinent part:

A domestic relations order meets the requirement [of a QDRO] only if such order:

22

      (i)     does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

      (ii)    does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

      (iii)   does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(D)(i)-(iii); *see also Johnson v. Johnson, et al.*, 541 So. 2d 554 (Ala. Civ. App. 1989) (holding that a domestic relations order, which ordered the administrator of an employee's pension plan to pay to the employee's ex-wife the full amount of a child support arrearage, was not qualified for purposes of ERISA, specifically failing under section 1056(d)(3)(D)(i), where the employee had not fulfilled certain conditions, and, therefore, was not eligible at that time to receive any of the pension benefits).

## V.    ARGUMENT

    The Retirement Board construed the terms of the Plan and applied the Plan's QDRO Procedures in determining that Ms. Woodall was not entitled to benefits under the terms of the Plan.  The Retirement Board's conclusion was based upon the facts that Ms. Woodall had not submitted a proposed QDRO before Mr. Fondren's death and had not offered any evidence to explain why she was not able to do so in the two-year period of time between the entry of the Divorce Decree and Mr. Fondren's disappearance.    The Retirement Board's administrative

decision, which is supported by substantial evidence in the administrative record, denying Ms. Woodall's request for survivor benefits under the Plan was correct from a *de novo* perspective under the first prong of the Eleventh Circuit framework, and thus defendants are entitled to judgment as a matter of law.

The Retirement Board did not make a determination as to whether the Divorce Decree itself met ERISA's requirement to be a valid QDRO. The issue of whether the Divorce Decree meets ERISA's statutory requirements is a question of law. Even if the Retirement Board had addressed that issue, this Court would review that decision *de novo*. In any event, the Divorce Decree is fatally defective as a matter of law because it does not meet ERISA's specificity requirements for a QDRO. Thus, Defendants are entitled to judgment as a matter of law on all claims in the complaint.

  **A.   The Retirement Board's Determination that Ms. Woodall is not Entitled to Benefits is Correct Because the Plan Provisions and the QDRO Procedures Relating to Entitlement to Benefits are Clear and Unambiguous, and the Board's Decision is Supported by the Administrative Record.**

   **1.   Ms. Woodall is not Entitled to Benefits under General Plan Rules Relating to Survivor Benefits.**

The Plan provisions relating to survivor benefits are clear and unambiguous.

- If a Plan participant is married at the time of his death, the Plan provides survivor benefits in the form of a life annuity to the

surviving spouse.[6]  (*See* 1997 Plan at AR-44 through AR-55, AR-218; 1997 SPD at AR-297-K; 2002 Plan at AR-327, AR-341 through AR-354; 2003 SPD at AR-438 through AR-439).

- If a Plan participant is single at the time of this death, all benefits under the Plan end.  (*See* 1997 Plan at AR-44 through AR-55; 1997 SPD at AR-297-J; 2002 Plan at AR-341 through AR-354; 2002 SPD at AR-399; 2003 SPD at AR-446).

Mr. Fondren was single at the time of his death.  When Mr. Fondren died without remarrying or naming Ms. Woodall as the alternate payee pursuant to a valid QDRO, the right to receive those benefits ended.  *See Samaroo v. Samaroo*, 193 F.3d 185, 190-91 (3d. Cir. 1999) (denying survivorship rights to former wife of pension plan participant where no QDRO was entered before the plan participant's death and where an attempt by the state court to confer survivorship rights to a former wife after the plan participant's death would have violated ERISA, 29 U.S.C. § 1056(d)(3)(D), by conferring benefits on former spouse after those benefits had lapsed by reason of the plan participant's death).  Therefore, under the above cited provisions of the Plan, Mr. Fondren's benefits ended at his death.  The Retirement Board correctly concluded that the above cited provisions of the Plan and the QDRO Procedures do not allow Ms. Woodall to receive survivor benefits in Mr. Fondren's pension benefits.

---

[6] A participant may elect to receive a single life annuity payable only to him or herself, but only if the spouse consents in writing.  (*See* 1997 Plan at AR-46; 1997 SPD at AR-297G; 2002 Plan at AR-343; 2002 SPD at AR-396; 2003 SPD at AR-438.)

    2.    **<u>Ms. Woodall likewise is not entitled to survivor benefits under the terms of the Plan where she failed to present a valid QDRO to the Retirement Board before Mr. Fondren's death and failed to explain why She could not have presented a valid QDRO between the entry of the Divorce Decree on February 14, 2001 and when Mr. Fondren disappeared in March 2003.</u>**

Under the terms of the Plan, because Mr. Fondren was not married at the time of his death, Ms. Woodall would only be entitled to benefits as an alternate payee in the event she met the Plan requirements for a QDRO and met the corresponding QDRO Procedures.

Section 14.2 of the Plan provides:

> [T]he Retirement Board and Trustee shall comply with any 'domestic relations order' (as defined in Section 414(p)(1)(B) of the Code) which is a 'qualified domestic relations order' *satisfying the requirements* of Section 414(p) of the Code.   The Retirement Board shall establish procedures for (a) notifying Employees and alternate payees who have or may have an interest in benefits which are the subject of domestic relations orders, (b) *determining whether such domestic relations orders are qualified domestic relations orders under Section 414(p) of the Code,* and (c) distributing benefits which are subject to qualified domestic relations orders.

(1997 Plan at AR-074; 2002 Plan, at AR-370) (emphases added); *see also* ERISA § 206(d)(3)(G)(ii), 29 U.S.C. § 1056(d)(3)(G)(ii) (requiring that a plan have written QDRO procedures which are to be used to determine if a DRO meets the requirements of a QDRO); Code § 414 (p)(6)(B)[26 U.S.C. § 414 (p)(6)(B)].

In keeping with statutory requirements and the terms of the Plan, the Retirement Board established the QDRO Procedures. (AR-502 through AR-511 [dated May 16, 2005]; AR-566 through AR-570 [dated January 7, 2003]). Paragraph III.C. of the QDRO Procedures addresses the treatment of a domestic relations order that is received after the death of a plan participant and provides as follows:

> If the QDRO Coordinator determines that the participant died prior to the time the Order is received, the QDRO Coordinator shall notify all surviving parties named in the Order and each named representative that an Order generally cannot qualify as a QDRO unless it is received before the death of the participant. In such event, the party seeking the QDRO may file a claim with the Board, in accordance with the terms and procedures under the Pension Plan, requesting that the Board consider whether an Order entered with respect to the deceased participant could constitute a QDRO. The Board shall then determine whether the Order could constitute a QDRO even though it was received after the death of the participant. The Board shall take into account the facts and circumstances it deems significant in making such determination including, but not limited to, whether there was sufficient time to obtain an Order prior to the death of the participant.

(AR-504; AR-568). [7]

---

[7] Defendants are aware that the Department of Labor has recently enacted an Interim Final Rule relating to the timing of domestic relations orders. *See* 29 CFR 2530.206; *see also* 72 Fed. Reg. 10070, *et seq.* (March 7, 2007). However, the new regulation does not apply to this case because the effective date for the interim final rule was April 6, 2007. Furthermore, even if the interim final rule was applicable to the facts of this case, it would not affect the outcome. The rule does

The Retirement Board established the general rule that a domestic relations order cannot qualify as a QDRO unless it is received before the death of the participant to promote consistency, accuracy and uniformity throughout its process of determining entitlement to benefits. Written procedures are established to govern this specific situation to ensure that the Retirement Board is not left attempting to guess the intent of the participant in his or her decision to name or not to name an alternate payee. (Jones Decl. at ¶ 10). The Board has a fiduciary responsibility to follow such written procedures. *See Kimble v. Metropolitan Life Ins. Co., et al.*, 969 F. Supp. 599, 603 (E.D. Cal. 1997) (holding that ERISA requires the plan administrator to discharge its duties "in accordance with the documents and instruments governing the plan" pursuant to 29 U.S.C. § 1104(a)(1)(D)).

Numerous cases provide support for the Retirement Board's denial of the benefits requested by Ms. Woodall based on the grounds that Ms. Woodall was not Mr. Fondren's spouse at the time of his death and no QDRO was in place at the time of Mr. Fondren's death naming Ms. Woodall as an alternate payee. In *Guzman v. Commonwealth Edison Co., et al.*, No. 99c582, 2000 WL 1898846, *1

---

not prohibit plan administrators, such as the Retirement Board in this case, from including within its QDRO procedures a general rule that a QDRO typically must be received by the Plan before the death of a plan participant. Moreover, the domestic relations order submitted in this case and the Divorce Decree fail to meet ERISA's specificity requirements.

(Dec. 28, 2000 N.D. Ill.), a Judgment for Dissolution of Marriage was entered in 1996 providing: "[T]he defendant is to have Qualified Domestic Relations Order in Plaintiff's SIP Plan and pension which is to be 50% accrued during marriage through entry of Judgment of Dissolution." In 1997, the participant died. *Id.* Subsequent to participant's death, the court entered an order entitled "Qualified Domestic Relations Order." *Id.* After the entry of the Order, Plaintiff's attorneys wrote to the Plan claiming that benefits were due to Plaintiff. The Plan denied the claim for benefits because plaintiff was not the participant's spouse at the time of his death and because no valid QDRO had been entered prior to the participant's death designating plaintiff as the alternate payee. *Id.* Like Ms. Woodall, the plaintiff sought a judgment declaring that the Judgment established that Plaintiff had a legal interest in the participant's benefits. *Id.* at *2. The issue before the court was whether either the 1996 Judgment or the 1997 Order constituted a QDRO. *Id.* Plaintiff argued that the 1996 Judgment was specific enough for the Plan to determine the number of payments or period from the Plan documents. *Id.* at *4. The Court held that the Judgment was not a QDRO and that plaintiff was not entitled to the benefits. *Id.* at *6. In reaching its decision, the Court relied on precedent holding that a QDRO must be unambiguous. *Id.* The Court stated that the important qualification in determining whether a QDRO is specific enough to create rights in an alternate payee is that the order lacks "no essential information"

29

and "there is no ambiguity as to how to dispense the proceeds of the ERISA plan." *Id.* at \*5 (citations omitted). Because the Judgment in *Guzman* did not unambiguously create a legal interest to the benefits in plaintiff, the subsequent Order inserting provisions relating to survivorship that did not appear in the Judgment was not allowed. *Guzman*, 2000 WL 1898846, at \*6.

In *Samaroo*, 193 F.3d at 186, the plaintiff and her former husband were divorced in 1984. The husband never remarried. The husband was a participant in a pension plan which, like the Plan involved in the present case, provided a pre-retirement survivor annuity to the surviving spouse of any Plan participant who died after vesting but before retiring. *Id.* at 187. The plan also provided that if there is no surviving spouse, there is no annuity. *Id.* The divorce decree entered in 1984 did not provide that the plaintiff would be entitled to the former husband's survivor's benefits. *Id.* After the death of her husband, the plaintiff sought her former husband's benefits. The Plan denied the Plaintiff's claim for benefits on the grounds that the divorce decree did not mention any entitlement to such rights, and in the absence of a surviving spouse or a QDRO designating a former spouse as such, there was no survivor's annuity payable. *Id.* In 1987, three-years after the entry of the divorce decree, the plaintiff obtained a *nunc pro tunc* amendment to the divorce decree purporting to create an entitlement to her former husband's benefits. The District Court held that the amendment could not qualify as a QDRO

30

because it would in effect violate 29 U.S.C. § 1056(d)(3)(D) by conferring survivor's benefits on the plaintiff after the benefits had lapsed due to the husband's death. The District Court concluded that entitlement to a survivor's annuity "had to be determined as of the day [the participant] died, and that the amended divorce decree represented an attempt to obtain increased benefits from the Plan." *Id.* at 188. Plaintiff appealed. The Court of Appeals for the Third Circuit affirmed. The Third Circuit held that when the participant died without remarrying or naming an alternate payee of the survivor's rights, the right to dispose of the benefits lapsed. *Id.* at 190. In reaching its determination, the Third Circuit stated:

> The fact that some participants die without a surviving spouse to qualify for benefits is not an unfair forfeiture … but rather part of the ordinary workings of an insurance plan. Allowing the insured to change the operative facts after he has lost the gamble would wreak actuarial havoc on administration of the Plan."

*Id.*

In both *Guzman* and *Samaroo*, the courts found that the plaintiffs were not entitled to benefits of the deceased participants because the divorce decrees did not unambiguously grant survivorship rights to the plaintiffs and no QDROs were in place prior to the death of the participants. The analysis used by the courts in these cases is directly applicable to the facts in the present case. In the present case, as in the above cases, there is no dispute that Ms. Woodall did not present a domestic

31

relations order to the Retirement Board until September 15, 2005, more than four years after the divorce and nearly two years after Mr. Fondren's body was discovered. (AR-545 through AR-551). Furthermore, as in the above cases and discussed in greater detail below, the divorce decree entered in 2000 did not unambiguously grant Ms. Woodall a survivor's annuity in Mr. Fondren's benefits. On May 12, 2006, the Board reviewed Ms. Woodall's appeal of Plaintiff's request for qualification of the DRO after Mr. Fondren's death. (*See* Minutes of Retirement Board Meeting, AR-487 through AR-490 and exhibits A-G thereto, AR-491 through AR-523). In reviewing the appeal, the Retirement Board considered the facts and circumstances associated with the appeal, the original claim and the claim denial letter. (AR-487 through AR-499). The Retirement Board also reviewed and considered its QDRO Procedures and previous cases involving submission of proposed QDROs following the death of the plan participant. (AR- 502 through AR-506; AR-520 through AR-23). Because of the Retirement Board's general rule that post-mortem orders will not be accepted, the fact that Ms. Woodall had ample time to obtain a QDRO from the court and submit it to the Retirement Board during the two year time period between the Divorce Decree and Mr. Fondren's disappearance, and because Ms. Woodall provided no extenuating circumstances preventing a timely submission of a domestic relations order, the Board denied the appeal. (AR 487-89). The Retirement Board noted

32

that exceptions to the general rule "would be limited to situations where the parties acted in an expeditious manner following the date of property settlement or divorce, but the death of the Plan participant occurred before the proposed alternate payee could have reasonably submitted a qualified domestic relations order." (Board Minutes, AR-488 and Exhibit F [AR-520 through AR-521] and Exhibit G [AR-522 through AR-523] thereto).

Ms. Woodall had ample opportunity to protect any rights she may have had in Mr. Fondren's benefits under the Plan, but failed to do so. Under the circumstances of this case, the Retirement Board would have been left to speculate, at best, about Mr. Fondren's intent. Such speculation by the Retirement Board would have constituted a breach of its fiduciary duties. *See Guzman,* 2000 WL at 1898846, *4 (holding that it was not possible to enter a valid qualified domestic relations order after the plan participant had died). In the absence of a valid QDRO, the general plan provisions discussed *infra* at p. 24-25 controlled. As explained above, since Mr. Fondren was single at the time of his death, and a valid QDRO was not in place naming an alternate payee, any and all survivor benefits in Mr. Fondren's pension benefits ended.

The Plan provisions and the QDRO Procedures are clear and unambiguous. The Retirement Board's determination was correct, is supported by the Administrative Record, and was reasonable and not arbitrary and capricious.

33

**B.** **The Divorce Decree Does Not Meet the Legal Standard Under ERISA for a QDRO As a Matter of Law Where the Divorce Decree Fails to Meet ERISA's Specificity Requirements.**

**1.** **Whether domestic relations order meets the statutory requirements for a QDRO is a question of law for the court.**

The Retirement Board did not undertake to determine whether the Divorce Decree met ERISA's requirements for a QDRO.  However, even if it had, the Retirement Board's decision would be subject to *de novo* review by this Court. The issue of whether an order meets ERISA's statutory requirements for a QDRO is a question of law for the judge.  *See Branco v. UFCW-Northern California*, 279 F.3d 1154, 1158 (9th Cir. 2002) (*citations omitted*) ("Whether a state court order constitutes a valid [QDRO] under ERISA, so that a pension benefit conferred through order comes within exception to ERISA's anti-alienation provision, is a question of law which is reviewed *de novo* on appeal."); *Dial v. NFL Player Supplemental Disability Plan*, 174 F.3d 606, 611 (5th Cir. 1999)). Additionally, general interpretation of a QDRO is a question of law and, therefore, is reserved for judicial consideration. *See e.g., Julia v. Bridgestone/Firestone, Inc.*, 101 Fed. Appx. 27, 34 (6th Cir. 2004).

**2.** **The Divorce Decree Does not contain the requisite specifications to be considered a QDRO.**

The Divorce Decree in this case does not qualify as a valid QDRO because it fails to meet ERISA's specificity requirements.  To qualify under the ERISA statute, a divorce decree must specify:

34

     (i)      the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

     (ii)     the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

     (iii)    the number of payments or period to which such order applies, and

     (iv)    each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C) (2000).

Ms. Woodall contends that the following provisions in the Divorce Decree are sufficient to create a QDRO:

5. The Defendant [David R. Fondren] shall pay to the Clerk of the Circuit Court the sum of $633.00 a month, commencing Sept. 1, 2000 and continuing until discharged by law, for the support and maintenance of the minor child of the parties [RAF].

9. For and during the time the Defendant is obligated to pay child support herein, Defendant shall maintain and name the Plaintiff [Debra S. Fondren] the beneficiary, as Trustee for the minor child of the parties, for all of his employment benefits such as retirement, pension, savings plans and stock ownership plans.

(Compl. at ¶ 7)[8].

An examination of these provisions leads to the conclusion that the Divorce Decree is fatally flawed as a matter of law and cannot constitute a QDRO. First,

---

[8]The Administrative Record does not contain a copy of the Divorce Decree. *See infra* at n. 4, p. 11. The Amended Complaint (Docket No. 13), did not include as an exhibit at copy of the Divorce Decree.

the Divorce Decree fails to meet the first QDRO requirement because it did not include the name and mailing address of Ms. Woodall.

Second, the Divorce Decree does not confer specific percentages or rights in benefits to either Ms. Woodall or the minor child and likewise does not detail any manner or methodology under which a specific percentage or amount is to be calculated. Furthermore, the Divorce Decree does not provide the number of payments or the durational period of the order. The Divorce Decree simply requires that Ms. Woodall be named the beneficiary. Ms. Woodall may argue that the language in Paragraph 5 of the Divorce Decree meets the second and third specificity requirements of the statute because it states an amount certain to be paid beginning on a date certain. Such an argument would be misplaced because, as a preliminary matter, the Divorce Decree does not provide that child support payments will be made from Plan assets pursuant to a QDRO. Moreover, the alleged $13,200 arrearage in child support payments (Appeal Letter, AR 493) was never reduced to a formal judgment and, therefore, an alleged property right requiring the amount to be paid by Mr. Fondren, much less Plan assets, was not created. Additionally, even if the Court concluded that the Divorce Decree met the specificity requirements as to the amount of child support payments, the Divorce Decree still would not be a QDRO in this case because upon Mr. Fondren's untimely death, he no longer was "obligated to pay child support" by operation of

law. *Pittman v. Pittman*, 419 So. 2d 1376, 1380 (Ala. 1982) (holding that at common law, "child support obligations terminate at death in the absence of an express provision having the effect of requiring continued payment after death"). In *Pittman*, the Alabama Supreme Court stated:

> [A] provision in a divorce decree for a monthly allowance for future maintenance and support does not charge the estate with those payments, but terminates upon the death of the husband, the event upon the happening of which the obligation of support would have ended had there been no divorce.

*Id.*

Moreover, even if Ms. Woodall were to argue that the benefits were intended to continue even after Mr. Fondren's legal obligation to pay child support was extinguished by his death, the Divorce Decree is completely silent on the issue of survivor rights. There is no mention whatsoever of any right of Ms. Woodall to be considered as Ms. Fondren's spouse (his alternate payee) for purpose of survivorship rights.

Finally, the Divorce Decree simply recites the following catchall language purporting to identify the employee benefits in which Ms. Woodall was to have had an interest: "As property settlement herein, Defendant is awarded Ownership of all employment benefits, as stated above [retirement, pension, savings plans and Stock ownership plans], Subject to the beneficiary designation required herein." (Compl. at ¶ 10). This catchall language that neither identifies with any specificity

37

whatsoever the employer who provided the benefits nor the name of the plans at issue fails to satisfy ERISA's requirements, leaves the Retirement Board to guesswork and, as aptly demonstrated in this case, increases administrative costs and burdens plan administration because such language breeds civil lawsuits. Notably, Alabama Power Company, Mr. Fondren's employer, offers three types of retirement benefits to its employees.  Accordingly, it is entirely unclear whether another plan could be involved in this potential obligation.  This is exactly the result Congress intended to eliminate by expressly listing the requirements for a valid QDRO.

If Mr. Fondren and Ms. Woodall had intended through the Divorce Decree the result that Ms. Woodall advocates in this suit, it would have been simple enough to have said so in the Divorce Decree.  Congress provided the roadmap. The Retirement Board cannot do for Ms. Woodall what she failed to do for herself. To do as Ms. Woodall requests, without the advantage of any direction from Mr. Fondren, the former Plan participant, would fly in the face of ERISA's specificity requirements and violate the terms of the Plan.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672 (6th Cir. 2000) (holding that the order neither literally nor substantially complied with the requirements set forth in Section 1056 because other than naming the parties, the order did not provide any of the required information, e.g., the participant's address, the amount

or percentage of the participant's benefits to be paid by the plan, the number of payments or durational period of the order, or the name of the plan).

### 3.    Payment of the survivor benefits sought by Ms. Woodall in this case would require the Plan to provide a type or form of benefit not otherwise provided under the Plan.

As stated above, one of the requirements under ERISA for a DRO to qualify as a QDRO is that the DRO must not require a plan to provide any type or form of benefit not otherwise provided under the terms of the plan.   29 U.S.C. § 1056(d)(3)(D)(i).   In this case, enforcing the Divorce Decree as a QDRO would require the Plan to provide a type of benefit not otherwise provided under the Plan and, therefore, it would be a violation of ERISA.   Mr. Fondren was not married at the time of his death.   Pursuant to the terms of the Plan, his benefits ended on the date of his death.   When he died, Mr. Fondren had not remarried and there was no valid QDRO in place naming Ms. Woodall as an alternate payee.   Therefore, upon Mr. Fondren's death, survivor benefits under the Plan died with him.   Therefore, the Plan's obligation would be increased by recognizing Ms. Woodall's claimed interest, thus violating ERISA.   29 U.S.C. § 1056(d)(3)(D).

In this case, the Divorce Decree itself does not provide that the child support payments will be made pursuant to a QDRO.   Furthermore, the arrearage of child support payments discussed in the Divorce Decree was never reduced to a formal judgment requiring the amount to be paid by a QDRO from the Plan.

The Retirement Board's appeal response dated May 26, 2006, states:

The Retirement Board concluded that the assertions in the appeal that Ms. Woodall is a trustee for a minor child, and that there remain unpaid child support obligations, do not warrant a finding that a domestic relations order could constitute a QDRO in this situation. In fact, there was no evidence submitted to establish that a court specifically ordered that a domestic relations order be submitted to the Plan on behalf of Ms. Woodall.

(AR-485 through AR-486).

The Plan only provides survivor benefits for a surviving spouse. Accordingly, requiring a survivorship benefit to be provided to the minor child requires the Plan to provide a type of benefit not otherwise provided under the Plan which is in direct violation of ERISA § 206(d)(3)(D)(i).  *See Samaroo v. Samaroo*, 193 F.3d 185, 190-91 (3d. Cir. 1999) (denying survivorship rights to former wife of pension plan participant where no QDRO was entered before the plan participant's death and where an attempt by the state court to confer survivorship rights to a former wife after the plan participant's death would have violated ERISA, 29 U.S.C. § 1056(d)(3)(D), by conferring benefits on former spouse after those benefits had lapsed by reason of the plan participant's death); *see also Johnson v. Johnson, et al.*, 541 So. 2d 554 (Ala. Civ. App. 1989) (concluding that DRO awarding arrearage to be taken from plan participant's pension benefits did not meet ERISA's requirements for a QDRO because it contemplated an immediate lump sum payment which was not available to the participant, who was 34 years of age at the time of the DRO and, therefore, would have required the

40

plan to provide a benefit not otherwise available under 29 U.S.C. § 1056(d)(3)(D)).

Furthermore, the Plan was not given notice of Ms. Woodall's claim until years

after Mr. Fondren's death. Therefore, the subsequent entry of the QDRO would

have "increased the plan's obligations without the plan having received any prior

notice." *Hogan v. Raytheon Co.*, 2001 WL 34148157, *4 (N.D. Iowa 2001) (*citing*

*Guzman*, 2000 WL 1898846).

The Divorce Decree fails to meet ERISA's specificity requirements as a

matter of law and, therefore, cannot be a QDRO. Even if the Court concludes that

the Divorce Decree meets ERISA's specificity requirements, it still cannot be a

QDRO because it would require the Plan to pay survivorship benefits not

otherwise available under the Plan.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court

enter summary judgment in their favor on all of the claims in the complaint, as

amended.

DATED this 30th day of October, 2007.

s/Leigh Anne Hodge
One of the Attorneys for The Southern
Company Pension Plan and Southern
Company Pension Plan Retirement Board

**OF COUNSEL:**
Leigh Anne Hodge (HOD010)
Lindsay S. Reese (REE061)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, Alabama 35201-0306
Telephone:  (205) 251-8100
Facsimile:  (205) 226-8798

Louis M. Calligas
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (877) 313-6054
E-mail: lcalligas@balch.com

42

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of October, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Stephen T. Etheredge
Dustin J. Fowler
Lexa Dowling
BUNTIN, ETHEREDGE & DOWLING, LLC
P.O. Box 1193
Dothan, Alabama  36302


s/Leigh Anne Hodge
One of the Attorneys for The Southern
Company Pension Plan and Southern
Company Pension Plan Retirement Board


Leigh Anne Hodge (HOD010)
Lindsay S. Reese (REE061)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, Alabama 35201-0306
Telephone:  (205) 251-8100
Facsimile:  (205) 226-8798

Louis M. Calligas
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (877) 313-6054
E-mail: lcalligas@balch.com