IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| R.A.F., a minor, by and through her mother as natural guardian and next friend, Debra S. Woodall, f/k/a Debra S. Fondren, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) ACTION NO.:2:07 CV-00192-WKW |
| v. | )<br>) |
| THE SOUTHERN COMPANY PENSION PLAN AND THE SOUTHERN COMPANY PENSION PLAN RETIREMENT BOARD, | )<br>)<br>)<br>)<br>) |
| Defendant. | ) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

**I.   INTRODUCTION**

*Statement of Case*

The Plaintiff adopts the time line of events as set forth in Defendants Statement of the Case but disputes the reasons set forth in the denial of benefits.

Defendant Southern Company Pension Plan and the Southern Company Pension Plan Retirement Board (hereinafter "Plan" or "Defendant") have succeeded in complicating a relatively simple issue, the end result of which was intended solely for the benefit of ex-spouses and dependents following divorce. *Boggs v. Boggs,* 520 U.S. 833, 845 (1997). Defendant makes it explicitly clear that its rejection of Ms. Debra Woodall's (hereinafter "Woodall" or Plaintiff")

claim for ERISA, 29 U.S.C. § 1002 *et seq.,* pension benefits was based entirely on the fact that she was not able to successfully present a Qualified Domestic Relations Order (hereinafter "QDRO") before the death of her former husband, Mr. David Fondren and that her divorce decree was not a valid QDRO pursuant to their Plan. The Defendant has devoted a great deal of energy in its brief to emphasizing the importance of the QDRO process without proper consideration given to the intent of the law.

Defendants' contentions rest significantly and precariously on the disputed contention that the procedures governing Plaintiff's right and that of her child to her ex-husband's pension plan are preempted by the ERISA statutory scheme. However, while it is generally true and admitted that the ERISA statute has requirements for a divorce decree to qualify as a QDRO, the Plaintiff's divorce decree clearly qualifies as a valid QDRO. Therefore, the fact that Plaintiff did not complete a QDRO for her late husband's benefits as conditions subject to the arbitrary and capricious whim of the Defendants is materially irrelevant to the outcome of the case.

Defendants seem to suggest that the divorce decree of the Plaintiff was not a QDRO for her ex-husband's pension benefits simply because it was not done to the satisfaction of the Defendants and received before his death. In that sense, the QDRO was nothing more than a "minor technicality".

Furthermore, submitting a QDRO would have been futile from the Defendants' point of view after the death of the Plaintiff's late husband. The Defendants made it very clear that it would reject the QDRO for pension benefits if the QDRO were done after the date of death. Therefore, it would have been a waste of time, money, and energy for the Plaintiff to seek a QDRO postmortem, even though there is no prohibition against it.

II.    NARRATIVE STATEMENT OF MATERIAL, UNDISPUTED FACTS

### Background Facts

Plaintiff will agree and stipulate to the factual representations set forth in the Defendants' Brief In Support Of Motion For Summary Judgment, with exception to number 8 of said brief. (*See Defendants's Brief ¶ 1-8).* The Defendants had a valid QDRO in the form of a divorce decree at the time of Mr. Fondren's death, contrary to the assertion of Defendants. *Id.*

III.   DISCUSSION

A.    The Divorce Decree Constituted a Valid Qualified Domestic Relations Order.

It should be noted that the Plaintiff's divorce attorney did not file a QDRO with the Defendants after the Plaintiff's divorce from David Fondren. The Plaintiff was not aware of the failure nor was she aware any specific document had to be prepared and submitted to Defendants for their approval until after Mr. Fondren was deceased. After David Fondren's death, the Plaintiff timely employed an attorney, Brandon Simmons, to recover the benefits she as well as her minor child were entitled. Defendants responded sending a sample QDRO as well including in the response the following "....Since Mr. Fondren was not married and no qualified domestic relations order was on file at the time of his death, rights to his benefit ceased under the terms of the Pension Plan at the time of his death." "Accordingly, a domestic relations order relating to Mr. Fondren's benefits under the Pension Plan that is **received after the date of his death could not constitute a QDRO....**" (AR-553 through AR 565**)**. The Plaintiff then hired another attorney who contacted the Defendants with a suggested QDRO asking if it was in the acceptable form with plans to obtain approval of the trial court if it met the Defendants requirements.(AR-545 through AR-548). Defendants responded to the submission of the proposed QDRO with this statement "...The proposed Order which you provided to us, however, would not constitute a

QDRO because it was received after the date of death of Mr. Fondren." (AR-533) In that same letter, the Defendants restating the fact that the Plaintiff's qualified domestic relations order cannot qualify as a QDRO since it was received after the death of the participant, Mr. Fondren. Plaintiff's claim denied**.** (AR-533)

The Plaintiff's divorce decree (*See Plaintiff's Exhibit A)* entitles her as well as the parties minor child to receive the pension benefits of David Fondren. For a divorce decree to qualify as a valid QDRO, the ERISA statute requires a divorce decree specify:

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C) (2000).

The ERISA requirements, as stated above, do not have to be complied with literally. In *Metropolitan Life Insurance Company v. Bigelow,* 283 F.3d 436 ( 2nd Cir. 2002), the 2nd Circuit held that applying QDRO requirements have not generally demanded literal compliance. *Id.; see also Stewart v. Thorpe Holding Co. Profit Sharing Plan,* 207 F.3d. 1143, 1151-53 (9th Cir. 2000). Additionally, the standard when evaluating whether a divorce decree meets the requirements for QDRO status is flexible. *See e.g., Metropolitan Life Insurance Company v. Williams,* 82 F. Supp.2d 1346 (11th Cir. 1999).

    1.    **<u>The omission of the last known mailing address of the participant and the mailing address of the alternate payee covered by the order is not fatal to the</u>**

**validity of the divorce decree as a valid QDRO.**

In *Metropolitan Life Insurance Co. v. Williams,* the Middle District of Florida held that the absence of Mr. William's address from the divorce decree and the lack of specificity as to Ms. Williams' address did not frustrate the purpose behind the decree. *Metropolitan Life Insurance Co. v. Williams,* 82 F.Supp.2d 1346 (M.D. Fla. 1999). The Court determined that the address of Mr. and Ms. Williams' could easily have been verified by obtaining the administrator's records or the state court records. *Id. at* 1353. As such, the omission to actually state the address was not deemed to be fatal to the divorce decree when determining the validity of the decree as a QDRO.

The Plaintiff's address could have easily been obtained. The divorce decree gives both the names of Mr. Fondren and the Plaintiff. *( See Plaintiff's Exhibit A).* In addition to the fact that the divorce decree gives both names, the divorce decree particularly describes the martial residence, which was given to Ms. Woodall. There can be no question that both the address of the deceased, Mr. Fondren, and Ms. Woodall could have easily been ascertained.

**2.     The divorce decree properly confers the amount or percentage of the participant's benefits and the manner in which such amount or percentage is to be determined.**

ERISA, 29 U.S.C. § 1056(d)(3)(C)(ii) (2000), requires "the amount or percentage of the participants's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined." *Id.* ERISA, 29 U.S.C. § 1056 (d)(3)(C)(iii), requires " the number of payments or period to which such order applies." *Id.*

The divorce decree (*See Plaintiff's Exhibit A)* is clear on the amount, percentage, manner of amount, and payments. The divorce decree contains the following provisions:

9. For and during the time that the Defendants is obligated to pay child support herein, Defendants shall maintain and name the Plaintiff the beneficiary, as Trustee for the minor child of the Parties, for **all** {emphasis added} of his employment benefits such as retirement, pension, savings plans and stock ownership plans.

10. As property settlement herein, Defendants is awarded ownership of **all** employment benefits, as stated above, subject to the beneficiary designation required herein.

There can be no ambiguity as to the above manner of payment when reading the divorce decree as a valid QDRO. The divorce decree clearly states the word, **"all"** when describing what benefits are to be paid. The word **"all"** encompasses all payments, all the durational periods, and all benefits. The wording of the divorce decree when dealing with this issue is absolute.

**3.    The Divorce Decree applies to the plan(s) currently in dispute.**

ERISA, 29 U.S.C. § 1056(d)(3)(C)(iv) (2000) requires, "each plan to which such order applies." *Id.*

Mr. Fondren worked for the Defendants for a multitude of years and was so employed at the time when the Divorce Decree was issued. The Defendants would have you believe that the failure to specifically name the name of the Southern Company in the divorce decree would leave the Retirement Board to guesswork, that is simply not the case. The fact that Mr. Fondren worked for the Defendants for a multitude of years and the Plaintiff knew whom to contact about the retirement, destroys all traces of any guesswork that the Defendants may rely upon.

**B.    The Court Should Decide the Issue of the Entitlement of Plaintiff to Benefits.**

Defendants have failed to show any reasonable basis for its denial of Plaintiff's claim to Mr. Fondren's pension payments. Their stated justification rests solely upon the fact that no document from which it could determine to be a qualified domestic relations order was received by them **prior** to the death of Mr. Fondren. As demonstrated, this justification is insufficient.

**1.      A de novo review of the Administrative Record is Appropriate**

Defendants have provided an erroneous analysis of when the Court is required to apply a de novo standard of review and when it is required to give deference to a plan administrator's decision to deny benefits. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989), the Supreme Court clearly annunciated that a de novo standard of review was to be applied to a plan administrator's decision ***unless*** [emphasis added] the plan granted the administrator with discretionary authority to determine benefits. That is, de novo, is the catch-all category applied to all cases unless there is evidence to the contrary granting special authority to the plan administrator. So, it cannot be the case, despite Defendants' best efforts, that a de novo standard applies only when there is 'no evidence' that the plan administrator has discretionary authority to make a final decision on a claim for benefits.

These arguments are irrelevant, however, given the fact that Defendants were only given discretionary authority to interpret the terms of the Plan. The discretionary authority contained in the language of the Plan does not apply to the Defendants' interpretation of separate documents related to the Plan, such as QDRO. "These questions do not require an interpretation of the Plan's terms and therefore de novo review [is] appropriate." *Hogan v. Raytheon,* 302 F. 3d 854, 856 (8th Cir. 2002). *See Dial v. NFL Player Supplemental Disability Plan,* 174 F.3d 606, 611 (5th Cir. 1999) (holding that the Court should review de novo the administrator's decision that a property settlement agreement constituted a QDRO because it involves interpretation of a settlement agreement and statutory construction, not interpretation of the plan). When Defendants denied Plaintiff's claim for ERISA benefits, it did so knowing that a divorce decree was issued concerning this matter.

This standard is much more sensible than the *Firestone* analysis, which permits review of

a decision using an arbitrary and capricious standard any time a plan administration grants itself with discretionary control to deny claims. Realistically speaking, a plan administrator would be foolish not to grant itself complete control to make decisions regarding disbursement of benefits. Defendants have done just that; granted themselves the authority to deny any claim regardless of its merit. However, when the Defendants made their decision to deny Plaintiff her ex-husband's pension payments, it not only interpreted certain provisions of the Plan but it also interpreted the divorce decree. The Plan certainly does not vest Defendants with absolute authority to interpret these non-Plan documents. For these reasons, it is only fair that this Court review the Defendants' decision to deny Plaintiff's claim de novo.

### C. PLAINTIFF SHOULD BE ALLOWED TO FILE A POSTMORTEM QDRO

If the Court finds the Defendant's arguments to be true, the Plaintiff should be allowed to obtain a QDRO via a *nunc pro tunc* order in State Court.

#### 1. A QDRO does not have to be obtained during the life of the participant.

In *Patton v. Denver Post Corporation,* the 10th Circuit held a *nunc pro tunc* order could be entered after the death of the participant. *Patton v. Denver Post Corporation*, 326 F.3d 1148 (10th Cir. 2003). In *Patton,* the Plaintiff obtained a *nunc pro tunc* order from the State Court for her deceased husband's benefits, who was the plan participant. *Id.* at 1150. The Court held that a *nunc pro tunc* order could be entered for the participants benefits after his death. *Id.* at 1151-1154. The Court reasoned that a *nunc pro tunc* order is to be considered entered before death and is more akin to the correction of a clerical error. *Id.* at 1152,1153. The Court went even further and stated, " this is precisely the type of situation, particularly in the domestic relations arena, for which the *nunc pro tunc* doctrine is applicable." *Id.* at 1154. Additionally, "*Nunc pro tunc* QDROs are desperately needed in the domestic relations arena. There must be a

way to secure a former spouse's property rights to a pension that could suddenly disappear as a result of a technicality or a family law attorney's inexperience in drafting QDROs." Gary Shulman, *QDROs-The Ticking Time Bomb,* 23 FAMILY ADVOCATE 26, 29 (2001); *See Estate of Becker v. Becker,* 32 P.3d 557, 559 (Colo.Ct. App.2000) ( "Court orders entered *nunc pro tunc*, or "now for then," are normally for the purpose of correcting an omission from the Court records and are deemed to have retroactive effect."); *See also, e.g.,* BLACK'S LAW DICTIONARY 1097 (7TH ed.1999); C.P. Jhong, Annotation, *Entering Judgment or Decree of Divorce Nunc Pro Tunc,* 19 A.L.R.3d 648 (1968).

In *Payne v. GM/UAW Pension Plan Adm'r,* No. Civ.A 95-CV-73554DT, 1996 WL 943424 (E.D. Mich. May 7, 1996) an opinion written by Judge Bernard Friedman of the District Court, the former wife of a plan participant sought pension benefits pursuant to the terms of a divorce granting her forty-five percent interest in her former husband's plan. *Id.* The Divorce Order stated that a QDRO would issue within thirty days, but the husband died well before the entry of the QDRO with the Court. *Id.* at 1. Because the Order was entered posthumously, the Plan administrator maintained that the Plan did not allow for establishment of surviving spouse after the death of the participant. *Id.* It argued that allowing for such would provide a benefit not otherwise provided in the plan, in violation of ERISA § 1056(d)(3)(D)(i). *Id.* at 4,5. Counsel for the plan argued that Participant never gave notice to the administrator prior to his death and therefore, an order entered posthumously would be invalid. *Id.* at 3-8. Despite the Defendant's argument, the Court held that there is no provision in ERISA that demands a participant to give notice of a QDRO prior to death. *Id.* at 5-8. The order was then amended *nunc pro tunc*, with the Court ruling the QDRO was to be considered entered before the death of the participant.

As previously asserted, a QDRO should have been in place for the Plaintiff and her child

regarding her former husband's benefits prior to his death. A review of the administrative record cited by the Plaintiff clearly demonstrates the Plaintiff's efforts to comply with the Defendants demands pertaining to the creation of a document that would meet their requirements of a valid QDRO. On each and every occasion, the response was the same- a sample form is enclosed and there is no way in which a valid QDRO could be considered in as much as it was not submitted prior to Mr. Fondren's death. A *nunc pro tunc* order issued in the case at bar would be consistent with the parties divorce decree should this Court determine paragraph 9 and 10 of the parties divorce decree created a valid qualified domestic relations order. "Courts in domestic relations contexts must have the power to effect equitable settlements by responding to newly acquired information or to changes in circumstances." *Patton,* 326 F.3d. at 1154. It would be a miscarriage of justice if Ms. Woodall was not allowed to obtain a *nunc pro tunc* order and thus was prevented from collecting her husband's pension for her benefit as well as the parties minor child.

## IV.   CONCLUSION

In all of this confusion, the true purpose of ERISA should not be forgotten. ERISA was designed to protect the financial security of ex-spouses and dependants after divorce. This action stems not only from Plaintiff's ex-husband's failure to pay child support, but also from the Plaintiff's attorney failing to file an acceptable QDRO or a QDRO at all. While the Plaintiff was struggling to support herself and her child, she thought that she was secure in the fact that her ex-husband's pension would provide for both. The circumstances of this case epitomize the purpose behind ERISA.

In the alternative, if the Court finds the Defendants' arguments persuasive, the Court should allow Ms. Woodall to obtain a *nunc pro tunc* order and order that her QDRO be issued.

For the foregoing reasons, the Plaintiff requests this Honorable Court deny all requests by the Defendants for Summary Judgment and allow this matter to proceed accordingly.

Respectfully Submitted,

s/ Dustin J. Fowler
Buntin, Etheredge, & Dowling, LLC
185 N. Oates Street
Dothan, Alabama 36301
(334) 793-3377

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 15th day of November, 2007, he electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filings upon the following:

Leigh Anne Hodge
Lindsey S. Reese
Balch & Bingham LLP
P.O. Box 306
Birmingham, Alabama 35201-0306

Louis M. Calligas
Balch & Bingham LLP
P.O. Box 78
Montgomery, Alabama 36101-0078

s/ Dustin J. Fowler