IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| R.A.F., a minor, by and through her mother as natural guardian and next friend, Debra S. Woodall, f/k/a Debra S. Fondren, | )<br>)<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) ACTION NO: 2:07 CV-00192-WKW |
| | ) |
| THE SOUTHERN COMPANY PENSION PLAN AND THE SOUTHERN COMPANY PENSION PLAN RETIREMENT BOARD, | )<br>)<br>)<br>)<br>) |
| Defendant. | ) |

**DEFENDANTS' REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants The Southern Company Pension Plan ("the Plan") and Southern Company Pension Plan Retirement Board (the "Retirement Board"), as fiduciary and administrator for the Plan, (hereinafter collectively referred to as "Defendants"), respectfully submit the following reply to Plaintiff's Brief in Opposition to Defendants Motion for Summary Judgment ("Opposition"):

## INTRODUCTION

The facts of this case are set forth in detail in Defendants' Motion for Summary Judgment. Plaintiff has adopted the time line of events set forth in Defendants' Motion for Summary Judgment. (Opposition, p. 1). This is an

ERISA[1] benefits case. The Plaintiff, Debra Woodall, seeks survivor benefits in her ex-husband's, David R. Fondren's, pension benefits. Ms. Woodall's Opposition argues that she is entitled to survivor benefits as a matter of law because the Divorce Decree entered February 14, 2001, in the Circuit Court of Lowndes County, Alabama, constitutes a valid Qualified Domestic Relations Order ("QDRO"). (Opposition, pp. 3-4). Ms. Woodall also argues that this Court should apply a *de novo* standard of review to the Retirement Board's determination denying Ms. Woodall's attempt to qualify the Divorce Decree as a QDRO nearly two years after Mr. Fondren's death. Finally, Ms. Woodall urges this Court (1) to allow her to proceed with obtaining a QDRO in the state court via a *nunc pro tunc* order and, (2) to require the Retirement Board to accept such order and pay survivor benefits. (Opposition, pp. 7-11).

Contrary to Ms. Woodall's assertions, the Divorce Decree does not meet ERISA's specificity requirements for a QDRO as a matter of law. Furthermore, because the Plan specifically grants the Retirement Board the discretion to interpret Plan provisions, the arbitrary and capricious standard governs the Retirement Board's actions and interpretations. Because the Retirement Board's interpretation of the Plan provisions at issue was correct, and its application of the facts to the

---

[1] The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et. seq.*

2

Plan provisions was reasonable and supported by substantial evidence, its interpretation of the provisions is neither arbitrary nor capricious. However, even if the Court concludes that the *de novo* standard is applicable to the facts of this case, the Divorce Decree is insufficient as a matter of law to entitle Ms. Woodall to survivor benefits. Defendants are entitled to judgment as a matter of law.

## ARGUMENT

**I.  The Divorce Decree Does Not Constitute a Valid Qualified Domestic Relations Order**

Ms. Woodall acknowledges in her Opposition that her divorce attorney "did not file a QDRO with the Defendants after the Plaintiff's divorce from David Fondren." (Opposition, p. 3). Therefore, in an effort to circumvent the established terms of the Plan and the QDRO procedures established by the Retirement Board in compliance with ERISA, and to obtain survivor rights to Mr. Fondren's pension benefits, Ms. Woodall now claims that the Divorce Decree entered in 2001 constitutes a valid QDRO. Ms. Woodall argues in her Opposition that the ERISA requirements necessary for an order to be considered a QDRO are "flexible" and "do not have to be complied with literally." (Opposition, p. 4). In addition, Ms. Woodall contends that the Divorce Decree: (1) is valid despite the omission of the alternate payee's mailing address; (2) properly confers the amount or percentage of the benefits and the manner in which such amount or percentage is to be

3

determined; (3) adequately details the number of payments or the time period to which the order applies; and (4) applies to the Plan, notwithstanding its failure to identify with any specificity the benefit plan(s) from which the proceeds are to be paid.

Contrary to Ms. Woodall's assertions, the Divorce Decree is not a valid QDRO because it fails to meet all four of ERISA's specificity requirements. To qualify as a QDRO under the ERISA statute, a divorce decree must specify:

(i)  the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C). The Divorce Decree (Opposition, Exhibit A) fails to meet even one of the ERISA specificity requirements.

The Divorce Decree fails the first requirement because it does not include Ms. Woodall's mailing address. While Ms. Woodall contends that her address easily could have been obtained by the Retirement Board because the Divorce Decree states her name, the Divorce Decree was never submitted to the Board for

its consideration.[2]   Ms. Woodall urges this Court to relax the first ERISA specificity requirement and to conclude that the Divorce Decree substantially complies with ERISA, citing *Metropolitan Life Insurance Co. v. Williams*, 82 F. Supp. 2d 1346 (M.D. Fla. 1999).  The order at issue in *Williams*, however, is distinguishable from the Divorce Decree because the *only* ERISA requirement that the *Williams* order failed to comply with was the listing of the last known mailing address.  *Id.* at 1352.

In *Williams*, the participant husband and the former wife jointly negotiated a property settlement, which was attached to the Judgment of Dissolution of Marriage.  The property settlement provided specific information about (i) the life insurance plan/policy to which it applied [the "policy issued by or through General Motors Acceptance Corporation in the approximate face amount of $51,500.00"]; (ii) the percentage of the proceeds of the policy to be awarded [former wife to receive all of proceeds in life insurance policy in that she "is currently named as the beneficiary of said policy . . ."] ; and (iii) the event upon which the award was to be made ["benefits are to be payable upon the death of the husband"].  *Id.* at 1352.  The property settlement bore the names and signatures of the husband participant and former wife and listed the address of the marital residence to be

---

[2] The Administrative Record does not contain a copy of the Divorce Decree.  (*See* Defendants' Brief in Support of Motion for Summary Judgment at n.4, p. 11; n.8, p. 35).

awarded to the former wife under the property settlement. The court held that the order, viewed in conjunction with the property settlement, expressly complied with ERISA requirements (ii) – (iv) of 29 U.S.C. § 1056(d)(3)(C). The court also concluded that the order substantially complied with the first ERISA requirement because the lack of specificity in the property settlement and order regarding the former wife's address did not undermine ERISA's goals that a plan administrator be able to easily identify the alternate payee in light of the fact that the property settlement included the address of the marital residence that was awarded to the former wife. *Id.* Even if this Court were to conclude that the Divorce Decree substantially complies with ERISA's first specificity requirement, it still is not a QDRO because, unlike the order *Williams*, the Divorce Decree is silent on ERISA requirements (ii) – (iv). 29 U.S.C. § 1056(d)(3)(C).

The Divorce Decree fails to comply with ERISA requirements (ii) through (iv) because it does not confer a specific percentage of benefits or detail any manner or methodology under which a specific percentage or amount is to be calculated, is silent regarding the number of payments or the period to which it applies, and fails to identify the employee benefit plan(s) to which it applies.

Ms. Woodall did not, because she cannot, cite any language in the Divorce Decree that meets ERISA's specificity requirements. Instead, she attempts to gloss over the glaring insufficiencies in the Divorce Decree and makes the broad brush

6


argument that "[t]he divorce decree is clear on the amount, percentage, manner of amount, and payments." (Opposition, p. 5). Ms. Woodall relies on paragraphs 9 and 10 of the Divorce Decree and the use of the word "all,"[3] claiming that the provisions entitle her survivor benefits in the Plan. (Opposition, p. 6).

    Ms. Woodall's arguments fail for the following reasons. First, the use of the word "all" in paragraph nine of the Divorce Decree clarifies nothing. Paragraph nine directed Mr. Fondren to name Ms. Woodall, in her capacity as Trustee, beneficiary "for all of his employment benefits such as retirement, pension, savings plans and stock ownership plans." Contrary to Ms. Woodall's argument, the use of the word "all" in paragraph nine did not mean that Ms. Woodall, in her capacity as Trustee, was awarded 100% of the benefits in some unnamed employee benefit plan(s) in which Mr. Fondren participated. Instead, a common sense reading of the use of the word "all" leads to the conclusion that it meant that Mr. Fondren was to name Ms. Woodall beneficiary of "each and every one" of certain employee

---

[3] The paragraphs of the Divorce Decree (Exhibit A to Opposition) relied on by Ms. Woodall provide as follows:

9.    For and during the time that the Defendant is obligated to pay child support herein, Defendant shall name the Plaintiff the beneficiary, as Trustee for the minor child of the Parties, for all of his employment benefits such as retirement, pension, savings plans and stock ownership plans.

10.    As property settlement herein, Defendant is awarded ownership of all employment benefits, as stated above, subject to the beneficiary designation required herein.

benefit plans that the order fails to identify. This common sense interpretation is bolstered when read in conjunction with paragraph 10, which awarded to Mr. Fondren "ownership of all employment benefits . . . subject to the beneficiary designation" in paragraph nine. If paragraph nine had awarded to Ms. Woodall 100% of Mr. Fondren's benefits, as she argues, there would not have been anything left to award ownership of to Mr. Fondren in paragraph ten. Even if Ms. Woodall could overcome the fact that the Divorce Decree fails to satisfy elements (ii) and (iii) of ERISA's specificity requirements, she cannot overcome the fatal fact that the Divorce Decree does not name with any specificity the employee benefit plan(s) to which it is intended to apply or the employer who sponsored and maintains such plan(s).

Additionally, even if the Court concluded that the Divorce Decree met the specificity requirements as to the amount of benefits and the period to which the order applies, the Divorce Decree still would not be a QDRO in this case because upon Mr. Fondren's untimely death, he no longer was "obligated to pay child support" (Divorce Decree, ¶ 9) by operation of law. *Pittman v. Pittman*, 419 So. 2d 1376, 1380 (Ala. 1982) (holding that at common law, "child support obligations terminate at death in the absence of an express provision having the effect of requiring continued payment after death"). The Divorce Decree does not state that

survivor benefits in any of the unidentified plans are to be paid to Ms. Woodall as an alternate payee.

To provide the requested benefits to Ms. Woodall without the advantage of any direction from Mr. Fondren, the former Plan participant, would fly in the face of ERISA's specificity requirements and violate the terms of the Plan.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672 (6th Cir. 2000) (holding that the order neither literally nor substantially complied with the requirements set forth in Section 1056 because other than naming the parties, the order did not provide any of the required information, e.g., the participant's address, the amount or percentage of the participant's benefits to be paid by the plan, the number of payments or durational period of the order, or the name of the plan).  Furthermore, to provide the requested benefits would require the Plan to provide a type or form of benefit not otherwise provided under the terms of the plan which is specifically prohibited by ERISA.  29 U.S.C. § 1056(d)(3)(D)(i). Upon Mr. Fondren's death, survivor benefits under the Plan died with him.[4] Therefore, the Plan's obligation would be increased by recognizing Ms. Woodall's

---

[4] Under the terms of the Plan, in the event a participant dies before distribution of his pension benefits commences (like Mr. Fondren), a survivor benefit shall be paid only to the spouse to whom the participant was married at the time of his death, except that the participant, with the spouse's consent, may elect to have the pension benefits paid only to the participant.  (*See* 1997 Plan at AR-44 through AR-55, AR-218; 1997 SPD at AR-297-K; 2002 Plan at AR-327, AR-341 through AR-354; 2003 SPD at AR-438 through AR-439).

claimed interest, thus violating ERISA. 29 U.S.C. § 1056(d)(3)(D). Additionally, because the Plan only provides survivor benefits for a surviving spouse, requiring a survivorship benefit to be provided to the minor child requires the Plan to provide a type of benefit not otherwise provided under the Plan which is in *direct violation* of ERISA § 206(d)(3)(D)(i). *See Samaroo v. Samaroo*, 193 F.3d 185, 190-91 (3d. Cir. 1999), *cert. denied*, 529 U.S. 1062 (2000).

The Divorce Decree fails to meet ERISA's specificity requirements as a matter of law. Defendants are entitled to summary judgment.

## II.     The Arbitrary and Capricious Standard of Review Applies

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court established that the arbitrary and capricious standard applies where the plan grants the administrator the discretion to interpret the plan provisions. Under the arbitrary and capricious standard of review, the Retirement Board's interpretation of the relevant plan provisions must not be disturbed if reasonable. *Firestone*, 489 U.S. at 111. Review of the Retirement Board's factual determinations is also governed by the arbitrary and capricious standard. *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1134, n.3 (11th Cir. 2001); *Torres v. Pittston Co.*, 346 F.3d 1324 (11th Cir. 2003); *Buckley v. Metropolitan Life*, 115 F.3d 936 (11th Cir. 1997). The Plan clearly designates the Retirement Board as the Administrator of the Plan and delegates to the Retirement Board the

10

discretionary authority to interpret the Plan, decide all questions of eligibility for benefits, and determine the amount of benefits.

Ms. Woodall asserts in her Opposition that the "discretionary authority contained in the language of the Plan does not apply to the Defendants' interpretation of separate documents related to the Plan, such as a QDRO." (Opposition, p. 7). Ms. Woodall's argument misses the mark because the Retirement Board did not attempt to determine whether the Divorce Decree met ERISA's legal requirements for a QDRO. In fact, the Divorce Decree in its entirety was never even submitted to the Board for its consideration. Instead, the Retirement Board interpreted and applied (1) Plan provisions governing entitlement to benefits, and (2) its established QDRO procedures.

In any event, Ms. Woodall fails to demonstrate what difference the standard of review would make to the outcome of this case. Facts are facts. At the time of Mr. Fondren's death, the Plan identified him as "Single." He had not remarried, and the Plan had not received a valid QDRO naming Ms. Woodall as an alternate payee. When Mr. Fondren died without remarrying or naming Ms. Woodall as the alternate payee pursuant to a valid QDRO, the right to receive those benefits ended.[5] *See Samaroo*, 193 F.3d at 190-91. At no time following the Divorce

---

[5] The Plan provisions relating to survivor benefits are clear and unambiguous.

11

Decree of February 14, 2001, or the discovery of Mr. Fondren's body in November 2003, was Ms. Woodall, as Trustee for the minor child, named as beneficiary of the Plan benefits. Furthermore, as discussed in greater detail above, the Divorce Decree which Ms. Woodall now seeks to have considered a QDRO completely fails to meet the ERISA statutory requirements. Therefore, even if the Court were to apply the *de novo* standard of review, Ms. Woodall is not entitled to the benefits sought.

### III. Ms. Woodall Should Not be Allowed to File a Postmortem QDRO More than Four Years After the Death of the Participant

Ms. Woodall argues in her Opposition that a QDRO does not have to be obtained during the lifetime of the participant. (Opposition 8-11).[6] As support for

---

- If a Plan participant is married at the time of his death, the Plan provides survivor benefits in the form of a life annuity to the surviving spouse.[5] (*See* 1997 Plan at AR-44 through AR-55, AR-218; 1997 SPD at AR-297-K; 2002 Plan at AR-327, AR-341 through AR-354; 2003 SPD at AR-438 through AR-439).

- If a Plan participant is single at the time of this death, all benefits under the Plan end. (*See* 1997 Plan at AR-44 through AR-55; 1997 SPD at AR-297-J; 2002 Plan at AR-341 through AR-354; 2002 SPD at AR-399; 2003 SPD at AR-446).

[6] The Retirement Board does not have an absolute rule that a QDRO must be submitted before the death of a plan participant. The QDRO procedures allow for flexibility and for consideration of facts the facts and circumstances particular to each case. (*See* Paragraph III.C. of the QDRO Procedures, AR-504; AR-568). The Retirement Board considered the facts and circumstances of Ms. Woodall's request. (AR-487 through AR-499). This is not a case where the parties had

her position, Ms. Woodall cites *Payne v. GM/UAW Pension Plan Administrator*, 1999 WL 943424 (E.D. Mich. May 7, 1996) and *Patton v. Denver Post Corp.*, 326 F.3d 1148 (10th Cir. 2003). However, neither the *Payne* analysis nor the *Patton* analysis is applicable to the present case. In both of those cases, unlike the case at hand, the process for obtaining a QDRO was well underway at the time the plan participant died, thus allowing the parties to resolve any ambiguities regarding the intent of the parties.

In *Payne*, the divorce judgment provided that a QDRO was to be entered under a separate order within 30 days of the judgment of divorce. *Payne*, 1999 WL 943424 at *1. The parties promptly began that process. However, the husband/plan participant died just one month after entry of the divorce. While not signed by the judge before the death of the participant, the proposed QDRO *was signed by the plan participant* and the ex-wife before the participant's death. *Id.* Moreover, the proposed QDRO specifically stated the percentage of the pension benefit to be awarded (45%) and identified the pension plan. *Id*. The court entered the order shortly after the plan participant's death. The proposed order met ERISA's specificity requirements; therefore, the plan administrator did not deny benefits for that reason. *Id*. at *1. Instead, the plan administrator denied the

---

undertaken to obtain a valid QDRO only to have that process interrupted by Mr. Fondren's untimely death.

benefits on the grounds that the order did not provide for survivor benefits. *Id.* The plan administrator determined that an award of benefits would be a violation of the terms of the plan because the order had not designated the ex-wife as a surviving spouse or surviving alternate payee. In fact the proposed order expressly stated that the ex-wife would not be designated as a surviving spouse because the plan participant had remarried on the day the divorce was final. The plan did not allow for a survivor to be named after the death of the plan participant. *Id*. at 2. As such, the plan administrator concluded that the order could not be qualified as a QDRO because it would have required the plan to provide a benefit not otherwise provided in violation of 29 U.S.C. § 1056(d)(3)(D). Subsequent to the plan administrator's denial, the court allowed the ex-wife to amend the proposed QDRO to provide for survivor benefits in light of the detail in the divorce decree specifically awarding 45% of the pension benefits and based upon the plan participant's testimony in open court affirming that he intended the former wife to receive 45% of his pension benefits. *Id*. at \*3. The plan administrator again denied the request for benefits, this time on the grounds that the plan did not allow the designation of a surviving spouse after the death of the plan participant. *Id*. at \*2. The ex-wife filed suit, and the court ordered payment of benefits, concluding that the amended QDRO was valid.

This case is factually inapposite to *Payne*. The Divorce Decree, unlike the QDRO in *Payne*, was never signed by Mr. Fondren before his death. Moreover, unlike the order in *Payne,* the Divorce Decree is silent as to a percentage or amount of benefits to be awarded or to the plan to which it applies. In *Payne*, the domestic relations court also had heard live testimony from the plan participant at the hearing on the divorce that he intended his ex-wife to receive 45% of his pension. Thus, there was ample evidence of the plan participant's intent. The court concluded that the amended QDRO that awarded survivor benefits to the ex-wife was nothing more than a formality that would effect the intent of the parties. Ms. Woodall has offered no evidence whatsoever regarding Mr. Fondren's intent.

In *Patton*, an ex-wife filed a civil action in federal district court seeking a declaration that a state court domestic relations order entered eleven years after the divorce and eleven months after the plan participant's death that awarded survivor benefits in her former husband's pension benefits was a QDRO. The ex-wife argued that such a result was justified because the original domestic relations order entered by the court awarding survivor benefits in her former husband's pension benefits inadvertently failed to include a second pension plan that was undisclosed to the parties by the employer at the time of the negotiations leading up to the property settlement. *Patton*, 326 F.3d at 1150. The district court concluded that the domestic relations order was a QDRO, and the Tenth Circuit agreed. The

Court was particularly persuaded by the fact that the *nunc pro tunc* order at issue did not "attempt to rewrite historical facts. Rather, it [was] more akin to the correction of a clerical error, which is an accepted use for *nunc pro tunc* orders." *Id*. at 1153. There was evidence that the parties exchanged financial information during the divorce proceedings. In response to a request for information about the husband's pension benefits, the husband's employer inadvertently informed the parties that the husband was a participant in only one pension plan, when in fact he participated in two different pension plans. The evidence indicated that this omission was inadvertent. As a result of the employer's inadvertent omission, only one pension plan was identified in the original QDRO entered by the court at the time of the divorce. *Id*. at 1150. The ex-wife discovered the mistake over eleven years later following her husband's death when the plan began paying the survivor benefits. The court rejected the plan's argument that the *nunc pro tunc* order required the plan to pay benefits that otherwise were not available under the terms of the second plan and, therefore, was a not a valid QDRO.

In this case, unlike *Patton*, Ms. Woodall is not seeking to correct a clerical error. Rather, she would like to rewrite the historical facts. Unlike *Patton*, there was no QDRO entered before Mr. Fondren's death. The original QDRO entered in *Patton* was clear that the ex-wife was to receive survivor benefits in the former plan participant's pension benefits and identified the only pension plan that the

16

parties were aware of at the time of the divorce based upon information supplied by the employer.  No such clarity exists in this case.

The Divorce Decree in this case is silent on all four of ERISA's specificity requirements.  29 U.S.C. § 1056(d)(3)(C).  Any effort to qualify the Divorce Decree at this point, nearly five years after Mr. Fondren disappeared and four years after his body was discovered, would be nothing more than an exercise in speculation and guesswork.  Furthermore, such an effort would fly in the face of the policy favoring clarity before pension benefits, which as a general rule under the ERISA statute are not assignable [29 U.S.C. § 1056(d)(1)], are awarded to someone other than the plan participant or his surviving spouse contrary to the terms of the Plan.  The limited exception to the statutory general rule against nonassignability of pension benefits is a valid QDRO.  29 U.S.C. § 1056(d)(3)(A).  ERISA provides a statutory roadmap to obtaining a valid QDRO.   Ms. Woodall's pleas that this Court allow her now to pursue a domestic relations order that will meet ERISA's requirements is too little too late because, as explained above, the Divorce Decree provides no guidance whatsoever about the necessary elements of a QDRO.

## CONCLUSION

Defendants' Motion for Summary Judgment should be granted.

DATED this 29th day of November, 2007.

        s/Leigh Anne Hodge
        One of the Attorneys for The Southern
        Company Pension Plan and Southern
        Company Pension Plan Retirement Board

**OF COUNSEL:**
Leigh Anne Hodge (HOD010)
Lindsay S. Reese (REE061)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, Alabama 35201-0306
Telephone:  (205) 251-8100
Facsimile:  (205) 226-8798
E-mail:  lhodge@balch.com
E-mail:  lreese@balch.com

Louis M. Calligas
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
E-mail: lcalligas@balch.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of November, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Stephen T. Etheredge
Dustin J. Fowler
Lexa Dowling
BUNTIN, ETHEREDGE & DOWLING, LLC
P.O. Box 1193
Dothan, Alabama  36302

        s/Leigh Anne Hodge
        One of the Attorneys for The Southern
        Company Pension Plan and Southern
        Company Pension Plan Retirement Board

        Leigh Anne Hodge (HOD010)
        Lindsay S. Reese (REE061)
        BALCH & BINGHAM LLP
        Post Office Box 306
        Birmingham, Alabama 35201-0306
        Telephone:  (205) 251-8100
        Facsimile:  (205) 226-8798
        E-mail:  lhodge@balch.com
        E-mail:  lreese@balch.com

        Louis M. Calligas
        BALCH & BINGHAM LLP
        Post Office Box 78
        Montgomery, AL 36101-0078
        Telephone: (334) 834-6500
        Facsimile: (334) 269-3115
        E-mail: lcalligas@balch.com