IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

R.A.F., a minor, by and through her        )
mother as natural guardian and next        )
friend, Debra S. Woodall, f/k/a            )
Debra S. Fondren,                          )
                                           )
            Plaintiff,                     )
                                           )
    v.                                     )        CASE NO. 2:07-cv-192-WKW
                                           )         [wo]
THE SOUTHERN COMPANY PENSION,              )
PLAN and THE SOUTHERN COMPANY              )
PENSION PLAN RETIREMENT BOARD              )
                                           )
            Defendants.                    )

## MEMORANDUM OPINION AND ORDER

Plaintiff R.A.F., a minor, by and through her mother as guardian and next friend, Debra. S. Woodall, brings this action pursuant to 29 U.S.C. § 1132, against Defendants The Southern Company Pension Plan Retirement Board ("Retirement Board") and The Southern Company Pension Plan ("Plan").  She  asks the court to declare that she is owed benefits from the Plan and to order the Retirement Board to pay her benefits owed under the Plan. This case is currently before the court on a motion for summary judgment filed by the Plan and the Retirement Board (Doc. # 20.)  The parties have consented to final judgment on the pleadings, briefs, and exhibits.  (Doc. # 46.)  The court finds that final judgment is due to be entered in favor of the **defendants**.

## I.  FACTS AND PROCEDURAL HISTORY

The facts are undisputed.  Debra Woodall ("Woodall") seeks survivor benefits as next

friend of her minor child, R.A.F., from her late ex-husband David Fondren's ("Fondren") pension plan. The relevant facts involve Woodall and Fondren's divorce, provisions of the Plan, and the Retirement Board's review of Woodall's claim.

Fondren was employed by Alabama Power and was a participant in the Plan. On February 14, 2001, Woodall and Fondren divorced. (Am. Compl. ¶ 7.) The divorce decree purported to divide Fondren's assets, including his pension benefits:

> 9. For and during the time [Fondren] is obligated to pay child support herein, [Fondren] shall maintain and name [Woodall] as beneficiary, as Trustee for the minor child of the parties, for all of his employment benefits such as retirement, pension, savings plans and stock ownership plans.
>
> 10. As property settlement herein, [Fondren] is awarded ownership of all employment benefits, as stated above, subject to the beneficiary designation required herein.

(Pl.'s Ex. A.)

During March 2003, Fondren was reported missing. On November 20, 2003, his body was discovered, and he was declared dead. (Am. Compl. ¶ 9.) At the time of his death, Fondren had not remarried, and the Plan identified him as "single." (Aff. Jones ¶ 4.) Prior to his death, the Plan had not received a valid qualified domestic relations order ("QDRO") identifying Woodall as the alternate payee.[1] (*Id.*)

The Plan designates the Retirement Board as the administrator of the Plan, and the

---

[1] In her brief, Woodall disputes that she did not have a valid QDRO at the time of Fondren's death. In the next paragraph of her brief, Woodall admits that her divorce attorney did not file the divorce decree with the defendants after the divorce. (Pl.'s Resp. Br. unnumbered page 3.) The court concludes that it is undisputed that the divorce decree was not filed with the defendants prior to Fondren's death.

Retirement Board is delegated authority to interpret the Plan.  (Plan[2] ¶¶ 10.1, 10.4, AR-361,

362.)  The Plan terms limit the payment of benefits if a participant dies before beginning to

receive retirement benefits.   In such cases, benefits are paid to a spouse to whom the

participant was married at the time of death, unless the participant, with the spouse's consent,

elected to have the benefits paid only to the participant.  (*Id.* ¶ 7.4, AR-343-44.)  Benefits end

if a participant is single at death.   (*Id.*)  However, there is an exception to this requirement

if a QDRO has been entered for an ex-spouse: "[T]he Retirement Board and Trustee shall

comply with any 'domestic relations order' which is a 'qualified domestic relations order'

satisfying the requirements of Section 414(p) of the Code."  (*Id.* ¶ 14.2, AR-370.)

The  Summary  of  Plan  provides  other  details  regarding  how  the  Plan  administers

QDROs and when the ex-spouse may be entitled to pension benefits:

> If your spouse dies or you divorce before your payments begin, you should
> notify the Employee Service Center.  Then your election of a joint and survivor
> annuity or survivor annuity with restoration will end, and no benefits will be
> payable after your death.  Your benefit will be paid as if you had always been
> single.  If your ex-spouse has a [QDRO], he or she may be entitled to all or a
> portion of your pension benefit.

(Summary of Plan; AR-397).  However, the QDRO must be filed with the Plan for the ex-

spouse to be eligible to receive benefits:

> A state court may order that your spouse, former spouse, or alternate payee is
> entitled to receive a portion or all of your benefits under the Plan . . . . Under
> federal law, however, your alternate payee may receive some of your Plan

---

[2]   The administrative record includes the 1997 Plan, 2002 Plan, 1997 Summary of Plan, 2002
Summary of Plan, and 2003 Summary of Plan.  Citations are to the 2002 versions of the documents unless
otherwise noted.   "AR" indicates a citation to the administrative record.

benefits **only if the Retirement Board receives** . . . a [QDRO] signed by the court.

(*Id.*; AR-400 (emphasis added).)  The Summary of Plan also explains there are additional procedures for qualifying domestic relations orders as QDROs: "[The] Retirement Board has established procedures for notifying you or anyone entitled to benefits that are the subject of a court order and for establishing whether a court order is a QDRO."  (*Id.*)

The Retirement Board promulgated a policy, "The Southern Company Pension Plan Procedures Pertaining to Qualified Domestic Relations Orders" ("QDRO Procedure"), regarding the qualification of QDROs.  (*See* AR-502.)  The Employee Retirement Income Security Act of 1974 ("ERISA") requires that the Retirement Board establish written policies regarding QDROs.  29 U.S.C. § 1056(d)(3)(A).  The Plan directs the Retirement Board to establish such policies:

> The Retirement Board shall establish procedures for (a) notifying Employees and alternate payees who have or may have an interest in benefits which are the subject of domestic relations orders, (b) determining whether such domestic relations orders are qualified domestic relations orders under Section 414(p) of the Code, and (c) distributing benefits which are subject to [QDROs].

(Plan ¶ 14.2, AR-370.)  Under these procedures, a domestic relations order received by the Retirement Board after the death of the participant generally will not qualify as a QDRO unless there was not sufficient time to obtain the order prior to the participant's death.

> If the QDRO Coordinator determines that the participant died prior to the time the Order is received, the QDRO Coordinator shall notify all surviving parties named in the Order and each named representative that **an Order generally cannot qualify as a QDRO unless it is received before the death of the**

4

**participant**. In such event, the party seeking the QDRO may file a claim with the Board . . . requesting the Board consider whether an Order entered with respect to the deceased participant could constitute a QDRO. The Board shall then determine whether the Order could constitute a QDRO even though it was received after the death of the participant. The Board shall take into account the facts and circumstances it deems significant in making such determinations including, but not limited to, **whether there was sufficient time to obtain an Order prior to the death of the participant.**

(AR-504 (emphasis added).)

After Fondren's death, Woodall contacted the Plan's QDRO Coordinator about having her divorce decree qualified as a QDRO. On May 25, 2004, the QDRO Coordinator responded that her "right to his benefits **ceased**" and that the "[divorce decree] could **not** constitute a QDRO since any payments required under such order would require the Pension Plan to pay benefits in a form not otherwise provided under the Pension Plan (*i.e.*, make surviving spouse payments on behalf of a single individual)." (AR-559 (emphasis added).) The letter did not inform Woodall that it was a "general rule" that an order received after a participant's death could not constitute a QDRO, that there was an exception to this rule, or the standard the Plan used in applying the exception. The QDRO Coordinator attached a copy of the QDRO Procedures, which explained that post-mortem QDROs are not "generally accepted" and the procedures for filing a claim.

Over fifteen months later, on September 15, 2005, Woodall sent a letter to the QDRO Coordinator requesting review of a proposed domestic relations order. The QDRO Coordinator responded: "The proposed Order which you provided to us, however, would not constitute a QDRO because it was received after the death of Mr. Fondren." (AR-533.) The

letter also stated that "an order **generally** cannot qualify as a QDRO if it is received after the death of the participant." (*Id.* (emphasis added).)

On November 26, 2005, Woodall appealed the decision to the Retirement Board. On May 26, 2006, the Retirement Board sent Woodall a letter informing her that her divorce decree did not qualify as a QDRO under the terms of the Plan. Specifically, the Retirement Board found that Woodall had ample time to have the divorce decree qualified as a QDRO in the two years between her divorce and Fondren's disappearance. The Retirement Board noted that "exceptions to the general rule would be limited to situations where the parties acted in an expeditious manner following the date of the property settlement or divorce." (AR-488 ¶ 7.)

On January 30, 2007, Woodall commenced this civil action against The Southern Company, Inc., in the Circuit Court of Lowndes County, as the natural guardian and next friend of her minor daughter, R.A.F. On March 2, 2007, The Southern Company, Inc., timely removed the case to federal court. The Southern Company, Inc., filed a motion to dismiss (Doc. # 4) because the incorrect party had been sued. The plaintiff filed an amended complaint (Doc. # 13), which substituted the correct parties, and the court subsequently denied the motion to dismiss as moot. (Doc. # 19.) On October 30, 2007, the Plan and the Retirement Board filed a motion for summary judgment (Doc. # 20).

## II. JURISDICTION AND VENUE

The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question).  The parties did not contest personal jurisdiction or venue, and the court finds there are allegations sufficient to support both.

### III.  STANDARD OF REVIEW

The parties disagree about what standard the court should use to review the Retirement Board's decision.  The defendants contend that the arbitrary and capricious standard is appropriate because the Retirement Board denied Woodall benefits based on its policy not to qualify an order received after the death of the participant as a QDRO.  Woodall contends that *de novo* review is appropriate because the decision about whether the divorce decree is a QDRO involves interpreting the divorce decree, which is not a plan document. Notably, neither party refers to the framework the Eleventh Circuit has adopted to resolve the issue of what standard of review to apply when reviewing a plan administrator's decision.

While ERISA does not set forth the standard which a district court uses to review an administrative decision denying benefits under 29 U.S.C. § 1132(a)(1)(B), courts have applied three standards: *de novo*, arbitrary and capricious, and heightened arbitrary and capricious review.  As the Supreme Court has described, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the administrator exercises discretion, "deferential (i.e., arbitrary and capricious review) review is appropriate."  *Doyle v. Liberty Life Assurance Co.*

7

*of Boston*, 511 F.3d 1336, 1339-40 (11th Cir. 2008). The heightened arbitrary and capricious standard applies "when an administrator with discretion operates under a conflict of interest." *Id.* at 1340.

Pursuant to *Firestone*, the Eleventh Circuit incorporated the varying levels of judicial review into a multi-step approach for courts to follow in reviewing a decision to deny benefits:

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e. the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.[3]

*Id.* (citing *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004)).

---

[3] Neither party argued a conflict of interest.

## IV.  ANALYSIS

Woodall argues she is entitled to benefits because the divorce decree meets the standards qualifying it as a QDRO.  The defendants respond that the divorce decree fails to meet nearly every standard required to qualify.

Under ERISA, a plan participant may not assign or alienate his benefits except through a QDRO.  29 U.S.C. §§ 1056(d)(1), 1056(d)(3)(A).  ERISA specifies the requirements a domestic relations order must meet in order to qualify as a QDRO.  *See id.* § 1056(d)(3)(B).

> [T]he term [QDRO] means a domestic relations order –
>
> (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
>
> (II) with respect to which the requirements of subparagraphs (C) and (D) are met.

*Id.* § 1056(d)(3)(B)(i).  Subparagraphs C and D, discussed below, define technical and substantive requirements for QDROs.  Thus, for an order to qualify as a QDRO, it must (1) be a domestic relations order creating or recognizing a right to benefits payable to a participant under the plan; (2) meet technical requirements; and (3) meet substantive requirements.  The court analyzes whether Woodall's divorce decree meets the requirements of each of these categories.

9

**A.**     ***Is the Divorce Decree a Domestic Relations Order Relating to Benefits Under a Plan?***

First, the potential QDRO must be a domestic relations order.  ERISA defines a domestic relations order as:

> [A]ny judgment, decree, or order (including approval of a property settlement agreement) which –
>
> (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
>
> (II) is made pursuant to a State domestic relations law (including a community property law).

*Id.* § 1056(d)(3)(B)(ii).  Woodall's divorce decree is a domestic relations order because it is a decree, which relates to the provision of child support, and was made pursuant to Alabama's domestic relations law.

The domestic relations order must "create[] or recognize[] the existence of an alternate payee's right to, or assign[] to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." *Id.* § 1056(d)(3)(B)(i). The divorce decree purports to recognize Woodall's right to receive Fondren's pension benefits as trustee for R.A.F. Accordingly, the divorce decree is a domestic relations order that recognizes Woodall's right to Fondren's benefits under his pension plan.

**B.**     ***Does the Domestic Relations Order Meet the Technical Requirements to Qualify as a QDRO?***

Second, for a domestic relations order to qualify as a QDRO, it must comply with

ERISA's technical requirements.

> A domestic relations order meets the requirements . . . only if such order clearly specifies –
>
> (i) the name and last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
>
> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
>
> (iii) the number of payments or period to which such order applies, and
>
> (iv) each plan to which such order applies.

*Id.* § 1056(d)(3)(C).

While the Eleventh Circuit has not addressed the issue of when a domestic relations order qualifies as a QDRO,[4] other courts have.  Courts liberally apply the technical requirements, recognizing that it is unrealistic to expect all domestic relations orders to literally comply with the requirements:  "It is asking too much of domestic relations lawyers and judges to expect them to dot every *i* and cross every *t* in formulating divorce decrees that have ERISA implications.  Ideally, every domestic relations lawyer should be conversant with ERISA, but it is unrealistic to expect all of them to be."  *Metro. Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1085 (7th Cir. 1994).

---

[4] Only two Eleventh Circuit cases even **mention** QDROs.  However, neither opinion analyzed when a domestic relations order qualifies as a QDRO.  *See Fontaine v. Guth*, 402 F.3d 1083 (11th Cir. 2005) (per curiam) (discussing when Georgia domestic relations law allows post-judgment modification of a QDRO); *Brown v. Conn. Gen. Life Ins. Co.*, 934 F.2d 1193 (11th Cir. 1991) (Johnson, J., dissenting) (discussing whether a claim involving a QDRO preempts state law).

To qualify as a QDRO, a domestic relations order contain essential information and must not be ambiguous about how the proceeds of the plan are to be divided. *See Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 422 (6th Cir. 1997) (holding that divorce decree which stated that the children were to receive two-thirds of the participant's ERISA life insurance policy "substantially complied with ERISA's requirements"); *Wheaton*, 42 F.3d at 1084 (finding that a divorce decree which failed to name the plan or specify how proceeds were to be divided qualified as a QDRO because there was not "significant ambiguity" as to how to dispense with the proceeds of the ERISA plan because the decree specified "the life insurance which is presently carried through his/her employer"). However, when a domestic relations order does not "literally [or] substantially" comply with the requirements set forth in § 1056, it will not qualify as a QDRO. *See Cent. States, Se. & Sw. Areas Pension Fund v. Howell*, 227 F.3d 672, 677-78 (6th Cir. 2000) (finding domestic relations order did not qualify as a QDRO when one party's address, the amount to be paid by the plan, and the number of payments were not contained within the domestic relations order).

The first requirement is that the domestic relations order contain both the name and last known address of the participant and alternate payee. This requirement does not mean that the domestic relations order must identify the ex-spouse as the "alternate payee" or the plan member as the "participant." *See In re Williams*, 50 F. Supp. 2d 951, 959 (C.D. Cal. 1999). The divorce decree identifies both Woodall and Fondren by name. (*See* Pl.'s Ex. A.)

The divorce decree does not, however, contain either party's address. Woodall argues

the court should not strictly construe this requirement. An address has not been required "where the address of the alternate payee is known to the plan administrator or the plan administrator has reason to know it independently from sources readily available to him." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1151(9th Cir. 2000) (internal citation and quotation marks omitted). In *Stewart*, the address of the ex-spouse of a plan participant was not explicitly stated in the order dissolving the marriage. However, the order awarded the residence to the ex-spouse and included the address of the home. *Id.* Additionally, the plan participant was a trustee of the plan. *Id.* The court concluded that the plan administrator was aware of the ex-spouse's address because the address was in the decree and because the participant was a trustee of the plan. *Id.*; *see also Carland v. Metro. Life Ins. Co.*, 935 F.2d 1114, 1120 (10th Cir. 1991) (finding address of beneficiary's attorney was a sufficient substitute); *Metro. Life Ins. Co. v. Williams*, 82 F. Supp. 2d 1346, 1352-53 (M.D. Fla. 1999) (finding order qualified as a QDRO even though the address of a party was not included because "the identity of the beneficiary can be easily determined" from the information contained in the order).

Another court has suggested that if the plan administrator possesses any document containing the parties' addresses then the requirement is met. *See Deaton v. Cross*, 184 F. Supp. 2d 441 (D. Md. 2002). The court cited legislative history showing that Congress intended that the "failure to put the last known mailing address of an alternate payee in a QDRO should not be the sole basis for rejecting a[n order] as qualifying." *Id.* at

13

443.  The court found that "[i]t is arguable that, based on its group health care records, the plan administrator could have combed through records or other plans it administered on behalf of [the plan participant] to discover the address of the [plan participant's ex-spouse and children], independent of the QDRO."  *Id.* at 443.  The court concluded, however, that the order was not a QDRO because it failed to comply with the other requirements.

Here, the Retirement Board did not have Woodall's address.  Woodall claims that the divorce decree describes the marital residence and that accordingly her address could have easily been obtained.  However, a closer look at the divorce decree reveals that it contains a description of the parcel of land but does not explicitly include the address.  Nor does the divorce decree contain her attorney's address.  (*See* Pl's Ex. A.)  In cases where courts have found the address was used because it was listed elsewhere in the document, either the party's or the party's attorney's address was included on the face of the document.  The court cannot find that the Retirement Board had knowledge of the address based on the description of a tract of land.

Woodall relies on *Williams* and argues that because the plan administrator had the parties' addresses it could have verified their addresses in plan records.  *See Williams*, 82 F. Supp. 2d at 1353.  Here, there has been no evidence – or  allegation – that the defendants possessed other papers containing Woodall's address.  The court finds that the defendants did not have knowledge of Woodall's address and that the divorce decree fails to meet this technical requirement.

14

The second requirement is that the domestic relations order specify the amount or percentage of the participant's benefits that the alternate payee is to receive. The divorce decree provides that "For and during the time [Fondren] is obligated to pay child support herein, [Fondren] shall maintain and name [Woodall] the beneficiary, as Trustee for the minor child of the Parties, for *all* of his employment benefits such as retirement pension, saving plans and stock ownership plans." (Pl.'s Ex. A. ¶ 9 (emphasis added).) The next paragraph specifies that "[a]s property settlement herein, [Fondren] is awarded ownership of all employment benefits, as stated above, subject to the beneficiary designation required herein." (*Id.* ¶ 10.)

Woodall argues that the divorce decree establishes that she is entitled to all of Fondren's employment benefits. However, the word "all" as used in the divorce decree defines for what type of benefits Woodall is to be named the beneficiary such as pension, savings, and stock ownership plans. The use of "all" does not define the amount of these benefits Woodall is to receive. Indeed, as the first phrase of paragraph 9 indicates, a reasonable reading of the provision would limit benefits to the amount of child support due. At best, the language is patently ambiguous. Woodall's proposed interpretation reads into the word "all" a meaning that resolves the ambiguity solely in her favor despite the reference to child support.

The third requirement is that the order must clearly specify the number of payments or period to which it applies. Woodall argues that the divorce decree's use of the word "all"

15

means that the plaintiff is entitled to all the payments that could be made.  However, the divorce decree states that Fondren is to name Woodall the beneficiary "[f]or and during the time that the Defendant is obligated to pay child support herein."[5]  (*Id.* ¶ 9.)  Under either reading, the divorce decree specifies the period of time for which the obligation remains.

Finally, the plan must identify "each plan" to which the order applies.  The divorce decree never specifically identifies the Plan but instead states that it applies to "all of [Fondren's] employment benefits such as retirement, pension, savings plans and stock ownership plans."  (Pl.'s Ex. A. ¶ 9.)  Another court found a reference to "any policy [or] contract of insurance" did not meet this standard because the domestic relations order "must at least contain some information to permit identification of the plan to which it applies and to avoid ambiguity." *Metro. Life Ins. Co. v. Mulligan*, 210 F. Supp. 2d 894, 898 (E.D. Mich. 2002).

Woodall claims that there is an implied designation of the Plan here because Fondren worked for The Southern Company for a number of years and was employed by it when he died.  However, Woodall's argument ignores the ERISA requirement that plans to which QDROs apply be designated with specificity.  The word "all" does not identify a specific plan, and the court concludes that the use of such blanket language is insufficient to identify the Plan.

---

[5] The defendants claim that the period of time Fondren was obligated to pay child support expired upon his death under Alabama law.  Nevertheless, the court finds that the decree limited the period for which the obligation was imposed.

16

While the technical requirements in ERISA are to be applied in a spirit of liberality, Woodall asks the court to quicken a divorce decree into something it bears little resemblance to – a valid QDRO.  Because the divorce decree fails to identify the parties' addresses, the percentage to be paid by the Plan, or each plan to which the order applies, the court concludes that it does not meet the technical requirements of a QDRO.

**C.    *Does the Divorce Decree Meet the Substantive Requirements of a QDRO?***

Even if the court found that the divorce decree met the technical requirements to qualify as a QDRO, it still fails to meet one of the substantive requirements.  To qualify as a QDRO, it must "not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." *Id.* § 1056(d)(3)(D)(i).

The defendants claim the divorce decree does not qualify as a QDRO because it forces the Plan to pay benefits not otherwise provided under the Plan.  The defendants claim that under the Plan, when a participant dies single without a QDRO in place, all benefits end. Because there was no QDRO on file when Fondren died, the Plan cannot pay any benefits. The Eleventh Circuit has not addressed whether ERISA requires a party to qualify a QDRO prior to the death of a participant, and there is a circuit split on this issue.  *See* Jayne E. Zanglein & Susan Stable, *ERISA Litigation* 887-88 (2d ed. 2005).  Some courts have required a party to qualify a QDRO before a participant's death.  *See Samaroo v. Samaroo*, 193 F.3d 185, 191 (3d Cir. 1999) (holding that a QDRO must be qualified prior to a participant's death because "successful operation of a defined benefit plan requires the plan's liabilities be

ascertainable as of particular dates"); *Guzman v. Commonwealth Edison Co.*, No. 99-582, 2000 WL 1898846, at *3 (N.D. Ill. Dec. 28, 2000) (stating that "[c]ourts have routinely concluded that rights to survivor's benefits are fixed a[t] the participant's death, and a valid QDRO cannot be entered after the participant's death that would expand the liability of the Plan"). Others have found ERISA contains no such requirement.  *See Patton v. Denver Post Corp.*, 326 F.3d 1148, 1153 (10th Cir. 2003) (allowing for a *nunc pro tunc* order); *Hogan v. Raytheon, Co.*, 302 F.3d 854, 857 (8th Cir. 2002) (holding that a domestic relations order could be qualified posthumously); *Trs. of Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 421-23, *amended*, 255 F.3d 661 (9th Cir. 2000) (finding that "[b]ecause a QDRO only renders enforceable an already-existing interest, there is no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death").  In the absence of Eleventh Circuit authority, the court assumes here that ERISA does not require a QDRO to be received prior to a participant's death.

The defendants' argument ignores that the Plan sometimes allows benefits to be paid when a QDRO is received after a participant's death.  Under the Retirement Board's policies, a QDRO received after a participant's death may be accepted if there was not sufficient time to file the QDRO before the death.  Therefore, defendants' argument is fundamentally flawed because the Plan itself allows for benefits to be paid in certain cases when a QDRO is not received prior to the death of a participant.

18

The closer question is whether this is an instance in which a decree can qualify as a QDRO under the Plan even though it was not received before the plan participant's death. The Retirement Board's policy allows it to qualify a domestic relations order filed after the death of a participant in view of the facts and circumstances, including whether there was sufficient time to obtain a QDRO after the divorce. Two years passed between Woodall and Fondren's divorce and Fondren's disappearance. Woodall has not offered an explanation as to why the divorce decree was not filed with the Plan during that time. Moreover, she did not attempt to obtain a QDRO immediately after Fondren's death; she waited two more years before formally petitioning the Plan for review of a proposed QDRO. While the Plan may have misinformed, if not outright misled, Woodall in the May 2004 letter, stating that the Plan never qualifies domestic relations orders received after the death of a participant as a QDRO, its actions do not immunize Woodall's failure to present the divorce decree to the Board in the two years between the divorce and Fondren's death.

Woodall argues that nevertheless she should be allowed to obtain a *nunc pro tunc* order so that the divorce decree can be qualified as a QDRO despite her tardiness. To support her argument she cites to two other cases in which courts allowed parties to obtain *nunc pro tunc* orders. However, neither case is analogous. In one case, the court granted the *nunc pro tunc* order because the divorce decree provided the parties with one month to obtain a QDRO, the plan participant died within that month, and the parties were waiting on the court to sign the document. *See Payne v. GM/UAW Pension Plan*, No. 95-73554, 1996 WL

943424, at *3 (E.D. Mich. May 7, 1996).  In the other, an ex-spouse had a QDRO as to one of the participant's pension plans, but another pension plan was omitted because a clerical error on the part of the plan.  *See Patton*, 326 F.3d at 1150.  Here, Woodall waited years – not one month – to get the divorce decree qualified as a QDRO.  Furthermore, Woodall has not claimed that her failure to receive benefits is due to a clerical error by the Plan.  Instead, her failure to receive benefits is because of her own dilatoriness.  Woodall has provided no compelling reason to allow a *nunc pro tunc* order this late in the day, over four and half years after the death of Fondren was confirmed.

After engaging in a *de novo* review, the court concludes that the divorce decree does not qualify as a QDRO.  Using the analytical framework from *Doyle*, this court concludes that the administrator's decision is due to be affirmed.[6]

## V.  CONCLUSION

It is ORDERED that the Retirement Board's decision that the Divorce Decree does not qualify as a QDRO is AFFIRMED.  An appropriate judgment will be entered.

DONE this 10th day of June, 2008.

/s/   W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

---

[6]  Even if the administrator's decision was *de novo* incorrect, the interpretation would still be reasonable under the arbitrary and capricious standard.  It would be reasonable for the defendants to interpret the Plan as imposing a time limit in which to file a QDRO with the Plan and that Woodall had waited too long.